UNITED STATES of America, Appellee,

v.

Carl L. BLEDSOE, Jr., Appellant.

UNITED STATES of America, Appellee,

v.

Thomas B. MOFFITT, Jr., Appellant.

UNITED STATES of America, Appellee,

v.

Russell E. PHILLIPS, Appellant.

UNITED STATES of America, Appellee,

v.

Ronald STAFFORD, Appellant.

UNITED STATES of America, Appellee,

v.

Quentin Darence CLONINGER, Appellant.

Nos. 80–1998 to 80–2001 and 80–2114.

United States Court of Appeals, Eighth Circuit.

Submitted Sept. 14, 1981.

Filed March 12, 1982.

Rehearing Denied June 28, 1982.

---

J. Whitfield Moody, U. S. Atty., Thomas M. Larson, Asst. U. S. Atty., Kansas City, Mo., Peter B. Shaeffer, Senior Trial Counsel, Chicago Regional Office, U. S. Securities and Exchange Commission, Chicago, Ill., Cynthia A. Clark, Asst. U. S. Atty., Kansas City, Mo., for appellee.

C. Brooks Wood, Kansas City, Mo., for appellant Bledsoe.

Mark W. Slatkin, Kansas City, Mo., for appellant Moffitt.

Thomas M. Bradshaw, Kansas City, Mo., for appellant Phillips.

Dennis J. C. Owens, Kansas City, Mo., for appellants Stafford and Cloninger.

Before LAY, Chief Judge, and HEANEY and ROSS, Circuit Judges.

LAY, Chief Judge.

The central issues in this case are (1) the requisite characteristics and proof of an "enterprise" under 18 U.S.C. § 1962(c), the Racketeer Influenced and Corrupt Organization Act (RICO) and (2) the propriety of joining charges of securities fraud against one defendant which are not alleged to be overt acts in furtherance of the conspiracy nor as predicate acts of racketeering in a RICO count with separate charges of securities fraud and conspiracy and RICO charges against four other defendants.

The Government originally sought and obtained an indictment variously charging 22 defendants. Count one charged all 22 defendants with conspiracy to violate RICO in violation of 18 U.S.C. § 1962(d) and alleged the commission of 93 overt acts in furtherance of the conspiracy. Count two charged all defendants with violation of RICO, 18 U.S.C. § 1962(c). This count alleged that defendants were associated with an enterprise, described as a group of individuals associated in fact to fraudulently sell securities of agricultural cooperatives in Missouri, Oklahoma, and Arkansas, and that defendants participated in the affairs of this enterprise through a pattern of racketeering activity. Count two detailed the acts constituting the pattern of racketeering as to each defendant in paragraphs 159 through 209 and in separate counts three through one hundred and sixty-one which were incorporated into count two by reference. The predicate acts of racketeering consisted of the fraudulent sale of securities of two Missouri cooperatives, United Farmers Association of America (UFA-Mo.) and Progressive Farmers Association (PFA); an Oklahoma cooperative, United Farmers Association of America (UFA-Ok.); and an Arkansas cooperative, Consumer-Farmers Association (CFA). Counts three through sixty-eight charged all five appellants and

fifteen others with violating 15 U.S.C. §§ 77q(a) and 77x and 18 U.S.C. § 2 by fraudulently selling PFA securities. Counts 69 through 161 charged defendants Phillips, Cloninger, Bledsoe and two others, but not Moffitt and Stafford, with violating 18 U.S.C. §§ 2 and 1341 by devising a scheme to defraud in the sale of PFA securities.

Counts 162 through 169 charged Phillips with evading personal income taxes and failure to file corporate tax returns. Counts 170 through 175 charged Phillips with violating 15 U.S.C. §§ 77q(a) and 77x by fraudulently selling securities of a Missouri corporation, Progressive Investors (PI).

Trial of 11 defendants commenced on October 2, 1979. The Government elected to try only Phillips, Bledsoe, Cloninger, and Donald Burks on counts 45 and 66 which were renumbered as counts three and four.[1] However, original counts three through one hundred and sixty-one remained incorporated in count two as predicate acts of racketeering. The Government elected not to join any of the tax charges and only two of the fraud charges against Phillips alone, counts 172 and 174 which were renumbered as counts five and six. For various reasons, only five defendants remained when the case was submitted to the jury on August 14, 1980. On August 25, 1980, the remaining five defendants were found guilty under all the counts with which they were charged. All five have appealed.

I. *Facts.*

In May of 1972, Phillips incorporated Progressive Investors, an ordinary business corporation. Through PI, Phillips offered and sold a security called an Estate Builder. The Estate Builder was an unsecured annuity contract in which PI agreed to make a lump sum payment to an investor after a period of years provided the investor made certain installment payments. PI did not engage in any investment program or substantial business of any kind. Income raised from security sales was diverted pri-

marily to Phillips' personal use through a number of personal corporations. Phillips, assisted by a small sales staff, made false statements and failed to disclose material facts in the sale of PI securities. Moffitt was involved in the sale of PI securities, but none of the other defendants were connected in any way to PI securities business nor was Moffitt named in counts five and six which charge Phillips with fraud in the sale of PI securities.

During the summer of 1972, Phillips consulted with Donald H. Gibson, an attorney who was an unindicted co-conspirator and the Government's principal witness in this case, concerning the sale of securities through agricultural cooperatives. Phillips described PI's securities sales. Gibson advised that co-ops were exempt from various registration requirements. Defendant Cloninger was present at several of these meetings. However, Cloninger is not alleged to have had any interest in the cooperative which Phillips and Gibson eventually formed.

Phillips and Gibson agreed to form the cooperative and evenly share its profits. In October of 1972, UFA–Mo. was incorporated as a non-stock, not-for-profit, agricultural cooperative. UFA–Mo. had no significant business operations other than the sale of a security called an Estate Builder. In April of 1973, Phillips left UFA–Mo. Gibson continued to operate the cooperative until approximately June of 1975.

In May 1973, Phillips incorporated PFA, a Missouri agricultural cooperative. Phillips recruited a board of directors composed primarily of farmers with little business experience. PI entered into a consulting agreement with PFA. Cloninger came to PFA in the spring or summer of 1973 to assist in its sale of securities. In November 1973, defendants Bledsoe and Burks were hired to manage PFA's security sales. PI thereafter assigned 25% of its interest in the consulting agreement to corporations controlled by Bledsoe, Burks, and Cloninger. Phillips, Bledsoe, Burks, and Cloninger

---

1. Burks was severed during trial.

made a secret agreement to evenly share all profits derived from PFA. Burks became president of PFA. Around the same time, PFA hired Moffitt and Stafford as salesmen. PFA originally sold Estate Builders and later also sold bonds and stock.

In April 1974, PI purchased a tract of land in Stone County, Missouri which was designated Table Rock Heights. Phillips obtained an inflated appraisal of the land. Phillips then began to contact PI investors to urge them to convert their securities into mortgage notes through additional payments. The mortgage note was a PI promissory note secured by a deed of trust for a lot in PI's tract. In actuality, no lots existed.

PFA had several legitimate business operations although evidence indicated that none proved profitable. In early 1975, PFA acquired land in Table Rock Heights through a merger with National Business Corporation (NBC). NBC was created to act as a conduit through which to move the land from PI to PFA. The merger also transformed PFA into a stock cooperative. Phillips, Bledsoe, Cloninger, and Stafford received substantial shares of the newly issued PFA stock.

In May 1975, Phillips suggested to Gibson that they form a partnership to organize cooperatives in other states. Phillips wanted Gibson to insulate him by not disclosing his interest in new co-ops and by serving as a channel through which Phillips would obtain his share of any profits. Gibson and Moffitt traveled to Arkansas, Texas, and Oklahoma to investigate the feasibility of organizing cooperatives in those states. Gibson, Moffitt, and Paul Canaday agreed to form UFA-Ok. and share its proceeds. Phillips and Gibson agreed to share Gibson's one-third interest, but Moffitt was unaware of Phillips' involvement. Phillips gave PFA materials to Gibson and UFA-Ok. was modeled after PFA. UFA-Ok. sold a security labeled Estate Builder. Stafford sold UFA-Ok. securities. Cloninger participated in one meeting with two officers of UFA-Ok. and Phillips at which the co-op's accounting procedures were discussed. He was not shown to have participated in any sales of UFA-Ok. securities or shared any of the co-op's profits.

In November of 1975, Gibson and Ron Elia agreed to share profits earned by an Arkansas cooperative. Gibson agreed to share his profits with Phillips. Consumer-Farmers Association was incorporated on January 23, 1976, as an Arkansas agricultural cooperative. Moffitt sold CFA securities called Estate Builders. UFA-Mo., UFA-Ok. and CFA each operated in tandem with separate "management companies" which played a role similar to that played by PI in relation to PFA. These companies were used to divert revenue to the principal operatives or their personal corporations. CFA's sale of securities was enjoined by the Arkansas Securities Commission in the spring of 1976. UFA-Ok. was similarly restrained by the Oklahoma Securities Commission in October of 1976.

In the fall of 1975, Progressive Farmers Association-Farmers Marketing Association (PFA–FMA) was incorporated. Burks was PFA–FMA's original president and was succeeded by Bledsoe when Bledsoe succeeded Burks as president of PFA in January 1976. PFA transferred several of its assets to PFA–FMA in return for unsecured promissory notes. PFA also made cash advances to PFA–FMA. PFA–FMA stock was held by those who held PFA stock when PFA–FMA was formed. Bledsoe, Cloninger, Stafford, and Phillips owned substantial shares of this stock. PFA–FMA did agree to pay 2% of its gross sales to PFA, but these payments were diverted to Phillips, Bledsoe and Cloninger.

Phillips, Bledsoe, Cloninger, and Burks agreed to terminate their interest in PI's consulting agreement with PFA in November 1975. In return, PFA made substantial payments over a period of time to these individuals. However, PFA continued to make payments to Burks, Cloninger, Bledsoe, and Phillips as if the consulting agreement was still valid. In October 1976, Bledsoe resigned as president of PFA, but continued as president of PFA–FMA. Both PFA–FMA and PFA were declared bankrupt in May 1977.

## II. *Misjoinder.*

Before trial commenced in this case, the trial court, the Honorable Warren K. Urbom presiding, responding to various motions from the defendants, expressed concern about the manageability and fairness of the trial. The court questioned the jurors' capacity to comprehend and separate the activities of and connections between individual defendants. In order to simplify the trial, the court directed the Government to reduce the number of counts to six. Notwithstanding the court's effort, the Government did not sever any of the allegations from counts three through one hundred and sixty-one from the substantive RICO count, count two, in which each of these allegations was incorporated by reference as predicate acts of racketeering. Thus, in effect, the Government submitted proof on 163 counts; the anticipated simplification and saving of time was not achieved.

Counts five and six charged only Phillips with securities fraud in the sale of PI Estate Builders and mortgage notes.[2] These counts were selected from among original counts 170–175. Several defendants moved to sever these counts before trial; during the trial the court granted all defendants a continuing motion to sever these counts. All motions were denied. On appeal, this objection is renewed.

The Government opened its case with evidence relating solely to Phillips and PI. Investors and salesmen testified about Phillips' formation of PI under the general business laws of Missouri in 1972. Phillips owned and controlled PI. Phillips began selling PI Estate Builders in 1972. In 1974, PI began selling mortgage notes, mainly to owners of Estate Builders. Estate Builders were converted to mortgage notes through the payment of a sum equal to the difference between the face amount of the note and the existing investment in the Estate Builder. The five-year, $4,000 notes were secured by lots in the Table Rock Heights subdivision owned by PI. Phillips obtained an inflated appraisal of this land which was used in the sale of mortgage notes.

The Government attempted to prove that Phillips did not intend to allow PI to fulfill its obligations to its investors. PI did not engage in any business activity which could have yielded a return to investors. Phillips appropriated the investments for his personal use. Funds received by PI were traced through a labyrinth of bank accounts and corporations controlled by Phillips. Many of these corporations engaged in no business activity.

The various pretrial motions to sever counts five and six were based on Fed.R.Crim.P. 8(b) which reads:

Two or more defendants may be charged in the same indictment or information if they are alleged to have participated in the same act or transaction or in the same series of acts or transactions constituting an offense or offenses. Such defendants may be charged in one or more counts together or separately and all of the defendants need not be charged in each count.

Under Fed.R.Crim.P. 8(b), the district court has no discretion to deny severance of misjoined defendants; we have held misjoinder of defendants is inherently prejudicial. *Haggard v. United States,* 369 F.2d 968, 972–73 (8th Cir. 1966), *cert. denied,* 386 U.S. 1023, 87 S.Ct. 1379, 18 L.Ed.2d 461 (1967); *United States v. Sanders,* 563 F.2d 379, 382 (8th Cir. 1977), *cert. denied,* 434 U.S. 1020, 98 S.Ct. 744, 54 L.Ed.2d 767 (1978); *see United States v. Marionneaux,* 514 F.2d 1244, 1248 (5th Cir. 1975); 8 Moore's Federal Practice ¶ 8.04[2], at 14 (2d ed. 1981).[3]

---

2. Specifically, count five involves the mailing of a PI mortgage note to Jerry F. Gallivan on or about October 23, 1974, and count six involves the mailing of a personal check from Hobart L. and Pauline Coffelt to PI on or about January 16, 1975.

3. In *Ingram v. United States,* the Fourth Circuit explained why misjoinder is inherently prejudicial:

The rule against jointly indicting and trying different defendants for unconnected offenses is a long-established procedural safeguard. Its purpose is to prohibit exactly what was done here, namely, allowing evi-

Additionally, it is a well settled rule in this circuit that the propriety of joinder must appear on the face of the indictment. *Sanders*, 563 F.2d at 382; *Chubet v. United States*, 414 F.2d 1018, 1020 (8th Cir. 1969); *cf.* 8 Moore's Federal Practice ¶ 8.06(3), at 39 (2d ed. 1981) (discussing retroactive misjoinder).

█ The prerequisites for joinder of defendants under rule 8(b) should be liberally construed. A broad reading of rule 8(b) is justified because Fed.R.Crim.P. 14 provides a means by which trial courts can protect defendants from prejudice resulting from joint trials. *Williams v. United States*, 416 F.2d 1064, 1069 (8th Cir. 1969). Thus, in evaluating joinder under rule 8(b), the trial court must balance its obligation to avoid prejudice that may result from joining multiple defendants against a policy favoring maximum trial efficiency.

The defendants urge misjoinder on the ground that the Government joined charges against the multiple defendants with criminal counts involving only Phillips. They allege that there is no proof which in any way implicates the other defendants in Phillips' fraudulent sales of PI securities. The Government implicitly recognized this fact in its opening statement when it told the jury, "There are two other counts in the indictment, counts V and count VI of the indictment. They relate to a separate fraud perpetrated and alleged in the indictment by Russell Phillips." [sic]

█ The indictment did not allege, even inferentially, any connection between the PI securities fraud described in counts five and six and the conduct of the other defendants detailed in counts one through four. The indictment did name Phillips in all six counts. The only connections between PI and the conduct of the co-ops found on the face of the indictment are the allegations in count one that LeRoy Brunner and Raymond Montgomery were in-volved in various overt acts in furtherance of the conspiracy (overt acts 10, 11, 13, 15, and 30) as officers of PFA and the allegations in counts 170–175 that Brunner and Montgomery were defrauded purchasers of PI securities; that it was an overt act in furtherance of the conspiracy (overt act 22) for Phillips, as president of PI, to sign a "Consulting Agreement" with PFA; that Phillips committed several overt acts in furtherance of the conspiracy (overt acts 26–28) by signing, as president of PI, several documents entitled "Partial Assignment" (to Burks, Bledsoe, and Cloninger); that it was an overt act in furtherance of the conspiracy (overt act 42) for Phillips, as president of PI, to transfer property to PFA; and that it was an overt act in furtherance of the conspiracy (overt act 45) for Phillips, as president of PI, to sign an "Agreement for Termination of the Consulting Agreement." The other connections appear in the allegations in paragraphs eight and seventeen of original counts three through sixty-eight that it was part of the scheme to defraud in the sale of PFA securities to cause PFA to agree to and to pay money to PI and the allegation in paragraph 12(q) of original counts three through sixty-eight that it was part of the scheme to defraud in the sale of PFA securities to fail to disclose the existence of a consulting agreement between PFA and PI.

The indictment did not reveal any basis for joinder. In counts one and two, charging violation of and conspiracy to violate RICO, the acts described in counts five and six are not alleged to be predicate acts of racketeering or overt acts in furtherance of the conspiracy. Count one alleged a conspiracy to violate RICO as described in count two. This violation involved the sale of securities through agricultural cooperatives. Counts five and six describe corporate (PI) not cooperative security sales. There is no allegation in the indictment that any of the other defendants partici-

---

dence in a case against one defendant to be presented in the case against another charged with a completely disassociated offense, with the danger that the jury might feel that the evidence against the one sup-ported the charge against the other. It is not "harmless error" to violate a fundamental procedural rule designed to prevent "mass trials."

272 F.2d 567, 569–71 (4th Cir. 1959).

pated in any fraudulent act involving sale of PI securities. Counts five and six stand remarkably alone.

■ The Government argues that the modus operandi described in counts five and six, sale of a security labeled an "Estate Builder," is the requisite link to the other counts. It states that the RICO and conspiracy violations as well as the substantive securities counts, three and four, each involve the fraudulent sale of securities called Estate Builders through the separate cooperatives operated by the defendants. This argument is inapposite. Under Fed.R. Crim.P. 8(b), mere similarity of offenses committed by two or more individuals is not a sufficient predicate for joinder. The Government confuses Fed.R.Crim.P. 8(a), which governs joinder of multiple charges against a single defendant, with the relevant rule 8(b). Under rule 8(a), two or more offenses may be joined if they are "of the same or similar character."[4] Rule 8(b) does not allow joinder on the same basis as rule 8(a); the words "same or similar character" are specifically omitted from rule 8(b). *See United States v. Marionneaux,* 514 F.2d 1244, 1248 (5th Cir. 1975). It is well established that similarity of offenses is not a sufficient basis for joinder under rule 8(b). *United States v. Martin,* 567 F.2d 849, 853 (9th Cir. 1977); *United States v. Jackson,* 562 F.2d 789, 796 (D.C.Cir.1977); *King v. United States,* 355 F.2d 700, 703 (1st Cir. 1966).

■ The Government also argues that the requirements of rule 8(b) are satisfied by proof of connections between PI and the crimes alleged in counts one through four. The Government urges that (1) Phillips utilized people in the operation of PFA who he had previously defrauded through the sale of PI securities, (2) land owned by PI which was fraudulently appraised at Phillips' direction was transferred to PFA, and (3) PI was used as a conduit to divert money away from PFA.

These connections between PI and the cooperatives reflect Phillips' common participation in both PI and PFA, but they do not satisfy rule 8(b). Clearly, Bledsoe, Cloninger, Moffitt, and Stafford are not *alleged* to have participated in the fraudulent sales of PI securities described in counts five and six. The only possible satisfactory nexus is that they, in the organization and sale of securities of PFA or the other cooperatives, were participating in a "series of acts or transactions" which included Phillips' sale of PI securities. But the indictment does not allege nor does the evidence reveal that the sale of PI securities described in counts five and six was part of the scheme described in counts one and two; nor does the indictment allege or even suggest the existence of a broader scheme encompassing the conduct described in counts five and six. Counts five and six singularly allege distinct acts involving only Phillips.

■ Rule 8(b) requires that there be some common activity involving all of the defendants which embraces all the charged offenses even though every defendant need not have participated in or be charged with each offense. *See United States v. Ford,* 632 F.2d 1354, 1372–73 (9th Cir. 1980), *cert. denied,* 450 U.S. 934, 101 S.Ct. 1399, 67 L.Ed.2d 369 (1981). In order to be part of the "same series of acts or transactions," acts must be part of one overall scheme about which all joined defendants knew and in which they all participated. *United States v. McKuin,* 434 F.2d 391, 395–96 (8th Cir. 1970), *cert. denied,* 401 U.S. 911, 91 S.Ct. 875, 27 L.Ed.2d 810 (1971). Although a conspiracy count is not always essential for joinder of counts which do not all include every joined defendant, in the absence of such an allegation, other facts must be alleged which at least suggest the existence of an overall scheme encompass-

---

4. The rule provides:

Two or more offenses may be charged in the same indictment or information in a separate count for each offense if the offenses charged, whether felonies or misdemeanors or both, are *of the same or similar character* or are based on the same act or transaction or on two or more acts or transactions connected together or constituting parts of a common scheme or plan.

Fed.R.Crim.P. 8(a) (emphasis added).

ing all the defendants and all the charged offenses. *See United States v. Porter*, 441 F.2d 1204, 1212 (8th Cir.), *cert. denied*, 404 U.S. 911, 92 S.Ct. 238, 30 L.Ed.2d 184 (1971). The indictment in this case does not allege any facts which suggest that Bledsoe, Moffitt, Cloninger, or Stafford participated in any type of scheme which involved Phillips' sale of PI securities. Because only Phillips was alleged to be involved in the sales of the PI securities and because the indictment does not describe a common scheme involving both the sale of PI securities and the conduct alleged in counts one through four, we find that counts five and six were misjoined with counts one through four. We therefore vacate the conviction of Bledsoe, Cloninger, Moffitt, and Stafford under counts one through four on the basis of misjoinder. Counts three and four, which charge Bledsoe and Cloninger, are remanded for a new trial.

It may be argued that the harmless error rule under Fed.R.Crim.P. 52(a) should be applied to the joinder. Some circuit courts have so ruled. *See, e.g., United States v. Seidel*, 620 F.2d 1006, 1017 (4th Cir. 1980); *United States v. Granello*, 365 F.2d 990, 995 (2d Cir. 1966), *cert. denied*, 386 U.S. 1019, 87 S.Ct. 1367, 18 L.Ed.2d 458 (1967). The difficulty with this argument is that the Supreme Court has ruled otherwise. In *McElroy v. United States*, 164 U.S. 76, 17 S.Ct. 31, 41 L.Ed. 355 (1896), in interpreting the statutory forerunner to Fed.R.Crim.P. 8(a) and (b), the Supreme Court observed:

> [I]t is contended that the judgments as to the other three defendants should be affirmed because there is nothing in the record to show that they were prejudiced or embarrassed in their defence by the course pursued. But we do not concur in this view. While the general rule is that counts for several felonies of the same general nature, requiring the same mode of trial and punishment, may be joined in the same indictment, subject to the power of the court to quash the indictment or to compel an election, such joinder cannot be sustained where the parties are not the same and where the offences are in nowise parts of the same transaction and must depend upon evidence of a different state of facts as to each or some of them. It cannot be said in such case that all the defendants may not have been embarrassed and prejudiced in their defence, or that the attention of the jury may not have been distracted to their injury in passing upon distinct and independent transactions. The order of consolidation was not authorized by statute and did not rest in mere discretion.

164 U.S. at 81, 17 S.Ct. at 33.

As Professor Charles Wright has observed:

> Indeed there would be no point in having Rule 8 if the harmless error concept were held applicable to it. If that concept could be applied, then defendant could obtain reversal only if the joinder were prejudicial to him. But Rule 14 provides for relief from prejudicial joinder, and a defendant can obtain a reversal, in theory at least, if he has been prejudiced even though the joinder was proper. If misjoinder can be regarded as harmless error, then reversal could be had only for prejudice whether the initial joinder was proper or improper. If that were true, it would be pointless to define in Rule 8 the limits on joinder, since it would no longer be of significance whether those limits were complied with, and the draftsmen would have been better advised to allow unlimited joinder of offenses and defendants, subject to the power of the court to give relief if the joinder were prejudicial.

1 C. Wright, *Federal Practice and Procedure* 329 (1969).

This same view was reinforced by Chief Justice Burger when writing as a circuit judge in *Ward v. United States*, 289 F.2d 877 (D.C.Cir.1961). Relying on the *McElroy* case he observed:

> The government contends that Lyons' acquittal on count 7 demonstrates that Ward did not suffer prejudice by the joinder. But "where multiple defendants are charged with offenses in no way connected, and are tried together, they are prejudiced by that very fact, and the trial

judge has no discretion to deny relief." *Ingram v. United States*, 4 Cir., 1959, 272 F.2d 567, 570. See also *Schaffer v. United States*, 1960, 362 U.S. 511, 80 S.Ct. 945, 4 L.Ed.2d 921; *McElroy v. United States*, 1896, 164 U.S. 76, 17 S.Ct. 31, 41 L.Ed. ·355; *United States v. Welsh*, D.C. 1953, 15 F.R.D. 189, 190.

289 F.2d at 878.

■■■ Notwithstanding our view that the harmless error doctrine is not applicable to rule 8(b), we have appraised the obvious misjoinder in terms of harmless error because of the long trial and the fact that other circuits have indicated that the harmless error rule is applicable. We find the misjoinder was clearly prejudicial to the other defendants. Since, as we discuss *infra*, we hold that the RICO counts were not properly proven, we direct our attention to the prejudice resulting from Phillips' joinder on counts five and six with the trial of Bledsoe and Cloninger, who were independently charged with substantive counts three and four.

Prejudice to Bledsoe and Cloninger arises from the misjoinder of Phillips and the fraud charges involving PI in the following manner:

(1) Both Progressive Investors and PFA sold securities known as "estate builders," and the damaging evidence regarding Progressive Investors' issuance and sale of estate builders operated to impeach the PFA estate builder as a legitimate fund raising instrument. The Government repeatedly and consistently attacked the estate builder as a "sham" instrument, as merely a "piece of paper." Such attacks made it appear to the jury that all estate builders are the same. Yet, (a) the estate builder is a legitimate form of annuity contract common in the insurance and securities industry; (b) none of the estate builder contracts contained any misrepresentations or omissions on their faces; and (c) an estate builder's legitimacy depends entirely, not on its own terms, but on the intentions of those who cause it to be issued by a particular company. Both the quantity and the nature of the evidence regarding Progressive Investors' estate builder sales operation necessarily tainted the evidence regarding the estate builder sold by PFA. Progressive Investors, unlike PFA, simply sold these estate builders on Phillips' promise to meet the obligations imposed by the instrument's terms but did nothing to earn money to provide the promised return. Thus, evidence offered on the legitimate operation of PFA's estate builder program was clearly tainted.

(2) The extensive and damaging evidence regarding Phillips' involvement in the Progressive Investors' estate builders sales coupled with Phillips' involvement in PFA operated to artificially connect Bledsoe and Cloninger to PI.

(3) The Progressive Investors counts cast the use of personal corporations in general in a bad light. The Government's evidence that the proceeds from Progressive Investors' estate builders sales were used for Phillips' personal benefit entailed tracing investors' funds through a labyrinth of Phillips' personal corporations. Bledsoe and others also used personal corporations.

(4) Counts five and six led to the presentation of evidence concerning the PI mortgage note program. This program could have been viewed as improper because the land was fraudulently appraised and because of the automatic renewal terms of the note. It follows that evidence of the fraudulent appraisal of the Table Rock Heights lots for the PI mortgage note program infiltrated the jury's analysis of the NBC/PFA merger, which involved a separate part of Table Rock Heights.

(5) The cross-examination of Phillips as to his conduct in PI was quite lengthy and involved. In addition, the Government allocated the first day and one-half of its closing argument to Progressive Investors and counts five and six instead of counts one through four. Both the organization of presentation and the quantity of evidence regarding the independent counts five and six necessarily impaired the jury's ability to segregate and compartmentalize the evidence regarding the other defendants and the other counts.

Although in most cases the precautions taken by the trial judge would be sufficient to prevent actual prejudice, in this case they are not sufficient. Here, the danger of jury confusion was substantial. There were over 100 limitations of proof with regard to counts five and six, and sometimes the limitation would shift back and forth from question to question. An average juror cannot be expected to keep the evidence compartmentalized with so many defendants and in such a complex factual background.

### III. *RICO Counts.*

All of the original 22 defendants were indicted under count two for violation of RICO, 18 U.S.C. § 1962(c). Additionally, each defendant was charged in count one with conspiracy to violate RICO under 18 U.S.C. § 1962(d). The indictment charged that each of the 22 defendants were employed by or associated with an "enterprise," to wit, "a group of individuals associated in fact to offer and sell securities of corporations organized as agricultural cooperatives in order to obtain money and property by fraudulent means from residents of the states of Missouri, Oklahoma and Arkansas, which enterprise was engaged in, and the activities of which affected, interstate commerce." Each defendant was charged with having "willfully and knowingly conducted and participated, directly and indirectly, in the conduct of the enterprise's affairs through a pattern of racketeering activity." The Government incorporated all of the original 159 substantive counts of mail and securities fraud as predicate acts constituting the pattern of racketeering alleged in count two.

RICO makes it a crime "for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt." 18 U.S.C. § 1962(c). The Act defines enterprise to include "any individual, partnership, corpo-

ration, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity." 18 U.S.C. § 1961(4). The Act defines a "pattern of racketeering activity" as the commission of any two of a specified number of federal and state crimes, including mail fraud under 18 U.S.C. § 1341 and security fraud under 15 U.S.C. § 77q(a), within 10 years of each other. 18 U.S.C. § 1961(1)(B) and (D).

Phillips, Bledsoe, and Cloninger do not now challenge the sufficiency of the evidence from which the jury found them guilty of the substantive crimes charged in counts three and four nor do any of the defendants challenge the sufficiency of the evidence of their commission of the alleged predicate acts of racketeering. We must recognize, however, that even if some of the defendants were guilty of securities fraud as charged in counts three and four or as predicate acts in count two, each was also charged with and convicted of a more serious crime under RICO. The maximum penalty under 18 U.S.C. § 1341 (mail fraud) is five years and $1,000. The maximum punishment for security fraud is five years and $10,000. 15 U.S.C. § 77x. By comparison, the maximum penalty under RICO is 20 years and $25,000 as well as potential criminal forfeitures. 18 U.S.C. § 1963(a). If, in fact, the Government did not prove the defendants violated RICO, then it is fundamental to fair process of law, regardless of how much we condemn their wrongful conduct, that they cannot be convicted under the Act.

We are satisfied that RICO was not designed to serve as a recidivist statute, imposing heavier sentences for crimes which are already punishable under other statutes. The Act was not intended to be a catchall reaching all concerted action of two or more criminals involving two or more of the designated crimes.

The inclusion of the RICO and conspiracy counts allowed the Government to join all of the original 22 defendants in the indictment even though not all of the defendants were involved in the formation and sale of

securities of all of the various cooperatives. The vehicle which the Government used to connect the five appellants, as well as the other 17 charged, and which enabled the Government to utilize evidence of fraud involving all of the co-ops was RICO and the broad tentacles of the conspiracy charge. Under Fed.R.Crim.P. 8(b), the Government was required to allege some type of overall scheme involving each of the defendants and all the fraud charges in order to join them under one indictment. This allegation of participation in an all-encompassing RICO enterprise was necessary even after the number of defendants was reduced to the present five. Without the broad allegation, the Government could not have introduced evidence of all of the 209 alleged predicate acts of racketeering and 93 alleged overt acts in furtherance of the conspiracy, some of which related to only one of the defendants. The Government concedes that had it alleged that the enterprise was a single cooperative, only evidence of mail and security fraud relating to that cooperative would have been admissible. More significantly, only those defendants who participated in the affairs of that co-op through a pattern of racketeering activity would have been susceptible to joint trial.

The Government must and does now assert that the RICO counts allege an enterprise consisting of a multistate association of all of the 22 original defendants. The Government specifically conceded at trial and now on appeal that the indictment does not charge that the enterprise through which the pattern of racketeering activities took place was PFA or any of the other agricultural cooperatives organized by the defendants. As the Government repeatedly stated in its closing argument, "It's the people and not the co-ops that constitute the enterprise." This concession was acknowledged by the trial court.[5]

Although a co-op, as a legal entity, could clearly qualify as an enterprise under RICO, the Government does not and cannot now argue that the enterprise was one or more of the cooperatives since the case was not tried on that theory. As we noted in *United States v. Anderson*, 626 F.2d 1358, 1362 n.4 (8th Cir. 1980), *cert. denied*, 450 U.S. 912, 101 S.Ct. 1351, 67 L.Ed.2d 336 (1981), (quoting *United States v. Carman*, 577 F.2d 556, 568 (9th Cir. 1978)), "Criminal sanctions cannot rest on what an appellate court thinks the jury would have done had the issues put to it been framed differently." Because the Government did not present such a theory at trial, we need not even consider the serious problems of variance which such a contention would raise. In *Stirone v. United States*, 361 U.S. 212, 80 S.Ct. 270, 4 L.Ed.2d 252 (1960), the Supreme Court held:

> [V]ariation between pleading and proof . . . destroyed the defendant's substantial right to be tried only on charges presented in an indictment returned by a grand jury. Deprivation of such a basic right is far too serious to be treated as nothing more than a variance and then dismissed as harmless error.

*Id.* at 217, 80 S.Ct. at 273.

*See also United States v. Anderson*, 552 F.2d 1296, 1301 (8th Cir. 1977); *United States v. Bertolotti*, 529 F.2d 149, 154–57 (2d Cir. 1976). Thus the convictions can only be sustained if we find sufficient evidence of a single enterprise composed of the various individual defendants associated in fact and distinct from the co-ops.

## A. Statutory Construction.

The Government argues, citing *United States v. Elliott*, 571 F.2d 880, 902 (5th Cir.), *cert. denied*, 439 U.S. 953, 99 S.Ct. 349, 58 L.Ed.2d 344 (1978), that RICO was passed to obviate the difficulty of proving a conspiracy. It urges that all those who participate in the affairs of an enterprise need not

---

**5.** In its memorandum and order disposing of appellants' post-trial motions, the trial court stated, "the prosecution of the present case proceeded upon the theory that the enterprise was the association of individuals and not the cooperatives which were formed by those individuals."

enter into an agreement encompassing all of its affairs. *Cf. Blumenthal v. United States*, 332 U.S. 539, 68 S.Ct. 248, 92 L.Ed. 154 (1947); *Kotteakos v. United States*, 328 U.S. 750, 66 S.Ct. 1239, 90 L.Ed. 1557 (1946) (describing requisite proof of conspiracy). Once an enterprise is formed, the Government argues, any person who becomes associated with or employed by the enterprise and carries out its affairs through a pattern of racketeering can be convicted under RICO. The Government asserts that defendants need not be aware of one another's activities, of the overall scope of the enterprise, or even of the existence of the enterprise. The argument is that conviction is predicated solely on defendants' relationship to the enterprise and commission of the predicate acts of racketeering.[6]

This construction of the requirements that a defendant be "employed by or associated with" an enterprise and that he or she "conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs" through a pattern of racketeering has some support in the case law. Courts have held that predicate crimes which constitute "a pattern of racketeering" under 18 U.S.C. § 1961(5) (defining "pattern of racketeering activity" as two acts of racketeering within ten years of each other) need not be related in any manner other than that they were perpetrated through an enterprise. *United States v. Weisman*, 624 F.2d 1118, 1122 (2d Cir.), *cert. denied*, 449 U.S. 871, 101 S.Ct. 209, 66 L.Ed.2d 91 (1980); *United States v. Rone*, 598 F.2d 564, 571 (9th Cir. 1979), *cert. denied*, 445 U.S. 946, 100 S.Ct. 1345, 63 L.Ed.2d 780 (1980). Some courts have interpreted the statutory language requiring that a person be "employed by or associated with" an enterprise and "conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs" to require nothing more than any association with the individuals constituting the enterprise. In *Elliott*, the Fifth Circuit wrote:

The substantive proscriptions of the RICO statute apply to insiders *and outsiders*—those merely "associated with" an enterprise—who participate directly *and indirectly* in the enterprise's affairs through a pattern of racketeering activity. 18 U.S.C. § 1962(c). *Cf. United States v. Forsythe*, 560 F.2d 1127, 1135–36 (3d Cir. 1977). Thus, the RICO net is woven tightly to trap even the smallest fish, those peripherally involved with the enterprise.

571 F.2d at 903.

*But see United States v. Mandel*, 591 F.2d 1347, 1375 (4th Cir. 1979), *cert. denied*, 445 U.S. 961, 100 S.Ct. 1647, 64 L.Ed.2d 236 (1980) (operation or management of enterprise required); *United States v. Forsythe*, 429 F.Supp. 715, 725 (W.D.Pa.) (employment or similar relationship required), *rev'd*, 560 F.2d 1127, 1135–36 (3rd Cir. 1977). Courts have also held that participation in the conduct of an enterprise's affairs through a pattern of racketeering activity does not involve any degree of scienter greater than that necessary to commit the crimes constituting the pattern of racketeering. *United States v. Boylan*, 620 F.2d 359, 361–62 (2d Cir.), *cert. denied*, 449 U.S. 833, 101 S.Ct. 103, 66 L.Ed.2d 38 (1980). We express grave doubts as to the propriety of the holdings in these cases, but given this loose conception of what it means to be "employed by or associated with" an enterprise and to "conduct or participate" in its affairs, it is more crucial for us to determine in this case what forms of organization or association in fact constitute an enterprise.

The Government argues that any association of individuals can be an enterprise. Under this theory, in any security or mail fraud case wherein a conspiracy of two or more persons is formed and two or more overt acts of fraud occur, defendants may be prosecuted under RICO with its heightened punishment. Similarly, under the

---

**6.** In the present case, there is added a conspiracy count (count one) alleging each of the defendants' general agreement to violate RICO. The Government's argument is somewhat vague as to whether knowledge of the enterprise or its essential purpose must be established to sustain the conspiracy charge. *See* note 10 *infra*.

Government's argument, any confederation, no matter how loose or temporary, of two or more individuals committing two or more sporadic crimes which are predicate crimes under RICO provides a basis for prosecution under the Act. *Cf. United States v. Aleman,* 609 F.2d 298 (7th Cir. 1979), cert. denied, 445 U.S. 946, 100 S.Ct. 1345, 63 L.Ed.2d 780 (1980) (two defendants convicted under RICO after committing three home burglaries). Although several courts have accepted this loose construction of RICO, we believe that the legislative history of the statute and an analysis of the statute itself as well as the surrounding criminal law indicates that such a broad construction is not warranted.

The primary intent of Congress in enacting 18 U.S.C. § 1962(c) was to prevent organized crime from infiltrating businesses and other legitimate economic entities. *See United States v. Turkette,* 452 U.S. 576, 101 S.Ct. 2524, 2532, 69 L.Ed.2d 246 (1981). The report of the Senate Committee on the Judiciary on the Organized Crime Control Act of 1969 states that 18 U.S.C. § 1961 et seq. (title IX of the act) has as its purpose the elimination of the infiltration of organized crime and racketeering into legitimate organizations operating in interstate commerce. S.Rep.No. 91–617; 91st Cong., 1st Sess. 76 (1969). *See also* Organized Crime Control: Hearings on S. 30, and related proposals Before the Subcomm. No. 5 of the House Comm. on the Judiciary, 91st Cong., 2d Sess. 106 (1970) (statement of primary sponsor Senator McClellan); *Id.* at 170 (comments of Justice Department); 116 Cong.Rec. 602 (1970) (statement of cospon-

sor Senator Hruska). When directed against infiltration of legitimate enterprises, the provisions have a relatively well defined scope of application. Legitimate businesses and other legitimate organizations tend to have a definite structure and clear boundaries which limit the applicability of a criminal statute aimed at the infiltration of criminal elements into these entities. Infiltration of legitimate entities also warrants the Act's severe sanctions. The Act's drafters perceived a distinct threat to the free market in organized criminal groups gaining control of enterprises operating in that market. These congressmen thought that organized criminal elements exert a monopoly-like power in the legitimate economic sphere. Organized Crime Control: Hearings on S.30, and related proposals Before the Subcomm. No. 5 of the House Comm. on the Judiciary, 91st Cong., 2d Sess. 106 (1970) (statement of Senator McClellan). The bill's sponsors also believed that such infiltration was a source of power and protection for organized crime and gave it a permanent base from which it was more likely to perpetrate a continuing pattern of criminal acts.

But Congress did not draft the statute to apply solely to infiltration of legitimate enterprises. The statute also reaches wholly criminal organizations. *Turkette,* 452 U.S. 576, 101 S.Ct. 2524, 69 L.Ed.2d 246.[7] However, the Act was not intended to reach any criminals who merely associate together and perpetrate two of the specified crimes, rather it was aimed at "organized crime." *Id.* 101 S.Ct. at 2531–32.[8] In *Turkette,* the Court upheld a RICO

---

**7.** Unfortunately neither *Turkette* nor this court's decision in *Anderson,* 626 F.2d 1358, had been released prior to the trial of the present case. *Anderson* was decided during the last days of the trial. On the basis of *Anderson,* the trial court modified its instruction in minor respects.

**8.** The Chairman of the House Subcommittee which held hearings on The Organized Crime Control Act stated at the start of the hearings: [W]e must take care to identify those types of criminal offense which we classify as "organized crime." The need to define the target of this legislation and to circumscribe the

reach of the substantive as well as the procedural provisions is underscored by the following brief statement from the 1967 report of the President's Commission on Law Enforcement and Administration of Justice: "A skid-row drunk lying in a gutter is crime. So is the killing of an unfaithful wife. A Cosa Nostra conspiracy to bribe public officials is crime. So is a strongarm robbery by a 15-year-old boy. The embezzlement of a corporation's funds by an executive is crime. So is the possession of marihuana cigarettes by a student. These crimes can no more be lumped together for purposes of analysis than can measles and schizophrenia,

conviction of individuals who participated in a criminal enterprise which evidence revealed was of a "professional nature" and executed "a number of distinct criminal acts." *Id.* 101 S.Ct. at 2527. The indictment described the enterprise as:

[A] group of individuals associated in fact for the purpose of illegally trafficking in narcotics and other dangerous drugs, committing arsons, utilizing the United States mails to defraud insurance companies, bribing and attempting to bribe local police officers, and corruptly influencing and attempting to corruptly influence the outcome of state court proceedings.

*Id.* 101 S.Ct. at 2526.

■ Obviously, no statute could and this statute was not intended to require direct proof that individuals are engaged in something as ill defined as "organized crime." *United States v. Campanale,* 518 F.2d 352, 363–64 (9th Cir. 1975), *cert. denied,* 423 U.S. 1050, 96 S.Ct. 777, 46 L.Ed.2d 638 (1976); *United States v. Chovanec,* 467 F.Supp. 41, 44–45 (S.D.N.Y.1979). The statute is an attack on organized crime, but it utilizes a per se approach. Thus Senator McClellan, the bill's principal sponsor, stated that the crimes enumerated in the definition of racketeering activity are not committed only by participants in organized crime, but argued that they are "characteristic of organized crime." McClellan, The Organized Crime Act (S.30) or Its Critics: Which Threatens Civil Liberties?, 46 Notre Dame Law. 55, 142–43 (1970). McClellan observes:

The danger that a commission of such offenses by other individuals would subject them to proceedings under title IX is [small] . . . since commission of a crime

listed under title IX provides only one element of title IX's prohibitions. Unless an individual not only commits such a crime but engages in a pattern of such violations, and uses that pattern to obtain or operate an interest in an interstate business, he is not made subject to proceedings under title IX.

*Id.* at 144.

Each element of the crime, that is, the predicate acts, the pattern of such acts, and the enterprise requirement, was designed to limit the applicability of the statute and separate individuals engaged in organized crime from ordinary criminals. The enterprise requirement must be interpreted in this light.

■ The crime defined in 18 U.S.C. § 1962(c) involves two modes of association with an enterprise.[9] In order to violate the provision, an individual must be "employed by or associated with" an enterprise and must "participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity." Construing the statute to give effect to all its words, it requires an association with an enterprise which is distinct from participation in the conduct of the enterprise through a pattern of racketeering activity. In order for such association, for example, formal membership in or employment by a legitimate organization or their equivalent in a criminal group, to exist, the enterprise must be more than an informal group created to perpetrate the acts of racketeering.

The Supreme Court, in *Turkette,* 101 S.Ct. at 2528–29, stated, "The 'enterprise' is not the 'pattern of racketeering activity'; it is an entity separate and apart from the

or lung cancer and a broken ankle. As with disease, so with crime: if causes are to be understood, if risks are to be evaluated, and if preventive or remedial actions are to be taken, each kind must be looked at separately. Thinking of 'crime' as a whole is futile."

Thus, when we speak of "organized crime" we must not generalize—we must define our terms and focus on specifics. Comparable precision is essential in developing a Federal legislative program to eradicate organized crime.

Organized Crime Control: Hearings on S. 30, and related proposals Before the Subcomm. No. 5 of the House Comm. on the Judiciary, 91st Cong., 2d Sess. 77 (1970).

**9.** The definition of "enterprise" in 18 U.S.C. § 1961(4) is clearly incomplete. If only the literal terms of the definition were utilized, the Act would apply both to "any individual" and to "any . . . group of individuals associated in fact" and the "enterprise" element would be wholly eliminated.

pattern of activity in which it engages. The existence of an enterprise at all times remains a separate entity which must be proved by the Government." This court, in *Anderson*, wrote, "The term 'enterprise' must signify an association that is substantially different from the acts which form the 'pattern of racketeering activity.' A contrary interpretation would alter the essential elements of the offense as determined by Congress." 626 F.2d at 1365.

■ The word "enterprise" ordinarily means an undertaking or project or a unit of organization established to perform any such undertaking or project.[10] However, under RICO, an enterprise cannot simply be the undertaking of the acts of racketeering, neither can it be the minimal association which surrounds these acts. Any two criminal acts will necessarily be surrounded by some degree of organization and no two individuals will ever jointly perpetrate a crime without some degree of association apart from the commission of the crime itself. Thus unless the inclusion of the enterprise element requires proof of some structure separate from the racketeering activity and distinct from the organization which is a necessary incident to the racketeering, the Act simply punishes the commission of two of the specified crimes within a 10-year period. Congress clearly did not intend such an application of the Act.

A comparison of the severe penalties authorized by RICO with those for conspiracy indicates that the Act must have been directed at participation in enterprises consisting of more than simple conspiracies to perpetrate the predicate acts of racketeering. Violation of RICO may be punished by a fine of up to $25,000 or imprisonment for up to 20 years or both, while conspiracy to commit an offense against the United States carries a maximum penalty of a $10,-000 fine and five years imprisonment. *Compare* 18 U.S.C. § 1963(a) *with* 18 U.S.C. § 371. If the enterprise element is satisfied by proof of conspiracy or looser associations not characterized by conspiratorial consent, the heightened punishment can only be justified by the requirement of two acts of racketeering and thus the Act is merely a recidivist statute. *Anderson*, 626 F.2d at 1367–68. RICO provisions of the Organized Crime Control Act could not have been intended to punish recidivism because the Act explicitly provided for such punishment in the following title (title X), now codified as 18 U.S.C. § 3575, which provides for heightened punishment of repeat offenders. *See* 18 U.S.C. § 3575(e)(1).

Because RICO does not require proof of a single agreement as in a conspiracy case, it creates a danger of guilt by association. *See United States v. Griffin*, 660 F.2d 996, 1000 (4th Cir. 1981). The individuality of guilt is assured by requiring proof that the enterprise with which individuals associated had certain distinct characteristics. As the Fourth Circuit wrote in *Griffin*:

> Proof of the existence of an associated-in-fact enterprise requires proof of a "common purpose" animating its associates, and this may be done by evidence of an "ongoing organization, formal or informal," of those associates in which they function as a "continuing unit." [*Turkette*,] 452 U.S. at 583, 101 S.Ct. at 2528. The ties between the individual associates that are implied by these concepts of continuity, unity, shared purpose and identifiable structure operate precisely to guard against the danger that guilt will be adjudged solely by virtue of associations not so related. They define the line between "concerted action" through "group association for criminal purpose,"

---

**10.** The term "enterprise" is also used in the Fair Labor Standards Act, 29 U.S.C. § 201 et seq. The Act defines enterprise as follows:

> "Enterprise" means the related activities performed (either through unified operation or common control) by any person or persons for a common business purpose, and includes all such activities whether performed in one or more establishments or by one or more corporate or other organizational units.

29 U.S.C. § 203(r).

The Supreme Court, in *Brennan v. Arnheim & Neely, Inc.*, 410 U.S. 512, 518, 93 S.Ct. 1138, 1142, 35 L.Ed.2d 463 (1973), identified the three main elements of an enterprise as related activities, unified operation or common control, and common business purpose.

for which "combination in crime" may constitutionally be proscribed, *Callanan v. United States*, 364 U.S. 587, 593–94 [81 S.Ct. 321, 325, 5 L.Ed.2d 312] (1961) and less clearly related conduct that may not be so proscribed and prosecuted.

660 F.2d at 1000.

Although commonality of purpose may be the sine qua non of a criminal enterprise, in many cases this singular test fails to distinguish enterprises from individuals merely associated together for the commission of sporadic crime. Any two wrongdoers who through concerted action commit two or more crimes share a purpose. This suggests that an enterprise must exhibit each of three basic characteristics.

In addition to having a common or shared purpose which animates those associated with it, it is fundamental that the enterprise "function as a continuing unit." In *Turkette*, the Supreme Court stated that an enterprise "is proved by evidence of an *ongoing* organization, formal or informal, and by evidence that the various associates function as a *continuing* unit." *Id.* 101 S.Ct. at 2528 (emphasis added). This does not mean the scope of the enterprise cannot change as it engages in diverse forms of activity nor does it mean that the participants in the enterprise cannot vary with different individuals managing *its* affairs at different times and in different places. What is essential, however, is that there is some continuity of both structure and personality. For example, the operatives in a prostitution ring may change through time, but the various roles which the old and new individuals perform remain the same. But if an entirely new set of people begin to operate the ring, it is not the same enterprise as it was before.

Finally, an enterprise must have an "ascertainable structure" distinct from that inherent in the conduct of a pattern of racketeering activity. *Anderson*, 626 F.2d at 1372. This distinct structure might be demonstrated by proof that a group engaged in a diverse pattern of crimes or that it has an organizational pattern or system of authority beyond what was necessary to perpetrate the predicate crimes. The command system of a Mafia family is an example of this type of structure as is the hierarchy, planning, and division of profits within a prostitution ring. *See, e.g., United States v. McLaurin*, 557 F.2d 1064, 1067–71 (5th Cir. 1977), *cert. denied*, 434 U.S. 1020, 98 S.Ct. 743, 54 L.Ed.2d 767 (1978) (describing structure of prostitution ring).

B. *Proof of Alleged Enterprise.*

During the summer of 1972, Gibson and Phillips met to discuss the sale of securities through an agricultural cooperative. Although Cloninger was present at several of these meetings, he was not party to the agreement between Gibson and Phillips which resulted in the formation of UFA-Mo. in October of 1972. A management company, Midwest Investment Group, was used to divert funds from UFA-Mo. to Phillips and Gibson. The only identifiable association of individuals distinct from the pattern of racketeering in the operation of UFA-Mo. was the agreement between Gibson and Phillips to share the co-op's profits. This association arguably exhibits a distinct structure and the common purpose of Gibson and Phillips. However, the difficulty with the assertion that it represents the beginning of the charged enterprise is that this "enterprise" had a short life.

In April of 1973, Gibson and Phillips had a misunderstanding and *dissolved* their arrangement. Gibson stayed on and operated UFA–Mo. Moffitt became a salesman for UFA-Mo. In May of 1973, Phillips independently formed PFA. At this point in time, no entity existed which encompassed both UFA-Mo. and PFA. Although they were operated in a similar manner, the only continuity between the original UFA-Mo. and PFA was Phillips' participation in both co-ops. The common purpose originally shared by Gibson and Phillips had broken down. An enterprise can grow and evolve, but it must be shown to have some continuity of structure and personality and the participants must maintain their common purpose.

Cloninger came to PFA sometime in the spring or summer of 1973. In November 1973, Phillips and Cloninger hired Bledsoe and Burks to manage PFA's security sales. Burks became president of PFA. The evidence shows that thereafter Phillips, Bledsoe, Burks, and Cloninger made an agreement to evenly share all profits derived from PFA. Moffitt and Stafford joined PFA as salesmen in the fall of 1973. Thus there is evidence of association among the five defendants in operating PFA and a shared purpose to profit from the fraudulent sale of PFA securities. Furthermore, the Government argues, "The secrecy of the agreement among Phillips, Cloninger, Burks and Bledsoe proved the existence of an association separate from the PFA cooperative." However, this external association did not include Moffitt and Stafford. But even assuming this agreement was the basis of an enterprise, the enterprise was unrelated to UFA-Mo. which, until June of 1975, was operated by Gibson using Moffitt as a salesman (Stafford also signed a UFA-Mo. salesman's contract, but made no sales).

At best, the Government has shown two separate associations of individuals without any overarching structure or common control. The evidence demonstrates only that the two schemes were conducted using the same modus operandi, that Phillips initiated both schemes, and that Moffitt and Stafford had some connection with both PFA and UFA-Mo.

The Government charges that the purpose of the alleged enterprise was to sell securities of agricultural cooperatives by fraudulent means in several states. On this basis, proof of fraudulent sales in both Oklahoma and Arkansas was admitted into evidence. It is conceded that Bledsoe did not participate in the planning or operation and may not even have had any knowledge of the Oklahoma or Arkansas co-ops. Stafford was a salesman for UFA-Ok., but had no connection with the activities of CFA in Arkansas. Thus, in order to argue that all defendants were implicated in the fraudulent acts in Oklahoma and Arkansas, it was essential for the Government to demonstrate the existence of an enterprise operating UFA-Ok. and CFA as well as UFA-Mo. and PFA in Missouri.

This court fails to find evidence of any association in fact exhibiting the requisite features which embraces the activities of all the co-ops. As in 1972, Phillips initiated the plan to organize co-ops in other states. Again, he returned to his old confederate, Gibson. Around this same time, UFA-Mo. became defunct. Gibson still had nothing to do with PFA in Missouri. Phillips discussed the plan with Gibson and the two of them formed a partnership to organize co-ops in other states. Thereafter, Gibson prevailed on Moffitt and Paul Canaday to form UFA-Ok. and share the proceeds. Unknown to Moffitt, Gibson had agreed to share his one-third interest with Phillips, his secret partner. Moffitt evidently had a falling out with Phillips and refused to participate in the new venture if Phillips had anything to do with UFA-Ok. The evidence shows that Cloninger's participation in UFA-Ok. amounted to his presence at one meeting with two officers of UFA-Ok. and Phillips at which the co-op's accounting procedures were discussed. There is no evidence indicating he participated in the operation of the co-op or received any of its profits.

In November of 1975, Gibson and another defendant charged in the indictment, Ron Elia, agreed to share profits earned by an Arkansas cooperative. Gibson once again agreed to share his profits with Phillips. Consumer-Farmers Association was thus incorporated on January 23, 1976, as an Arkansas agricultural cooperative. There is evidence that Moffitt sold CFA securities.

The only association which embraced the Arkansas and Oklahoma operations was the agreement between Gibson and Phillips. This agreement is temporally disjunct from their original agreement. The other defendants did not participate in this association except through their roles in the individual cooperatives. The new agreement did not relate to the operation of UFA-Mo. or PFA. There simply was no structured association, apart from the individual co-

ops, which exhibited any degree of continuity over the period between 1972 and 1977 and which was concerned with the operation of all four co-ops.

▪ Although many of the defendants played various roles in UFA-Mo., PFA, UFA-Ok., and CFA, these roles cannot be seen as constituent elements of a larger structure. Apart from the individual co-ops, the evidence reveals loose and discontinuous patterns of associations and agreements, primarily between Phillips and Gibson, contemplating the illegal use of the co-ops. We find no real evidence of a structure, a pattern of authority or control, or of continuity in the pattern of association or the common purpose of all of the defendants. At best, there is proof of various ventures initiated by Phillips and sometimes Phillips and Gibson in which many of the defendants from time to time participated. This evidence is not sufficient to support conviction under RICO.[11] Thus we conclude the evidence in this case does not support the allegation that a single enterprise existed which was distinct from the individual co-ops, which operated in Missouri, Oklahoma, and Arkansas, and which continued to exist from mid-1972 until the spring of 1977.[12]

On this basis, we reverse the convictions of all defendants under counts one and two.

### IV. Phillips' Remaining Issues.

We now examine Phillips' claim that he is entitled to a new trial because of prejudicial trial error. We discuss only those alleged errors which he asserts affected his convictions under counts three through six. Phillips urges (1) it was reversible error for the trial court to refuse to grant him more than $10,000 plus $1,000 expenses in order to obtain the assistance of a business consultant; (2) counts five and six were misjoined with counts one through four or, in the alternative, that said joinder was prejudicial; (3) he was prejudiced by joinder with defendant Burks; (4) the prosecution illegally obtained and introduced as evidence certain taxpayer return information; (5) several of his statements which the Government possessed were not initially disclosed; (6) the prosecution initially failed to disclose other evidence in violation of the Jencks Act and the Brady rule; (7) the trial judge erred in various evidentiary rulings; and (8) several statements in the prosecutor's closing argument constituted prosecutorial misconduct.

We find first that many of these issues involve rulings which fall within the discretion of the trial judge. Second, we note that even if error was committed, this court must evaluate this type of error in the context of the complete evidentiary record supporting the Government's case. We have reviewed the large record, almost 200

---

**11.** Assuming the Government's evidence was sufficient to establish the existence of an enterprise, the district court nonetheless committed prejudicial error in instructing the jury that it could, under the facts presented, determine the nature and scope of the enterprise. The enterprise was that charged in the indictment, a group of individuals associated in fact to sell securities through agricultural cooperatives by fraudulent means in Missouri, Oklahoma, and Arkansas. Under the court's instruction, the jury could have found the enterprise was simply any one of the cooperatives.

**12.** Assuming there was sufficient evidence to show a substantive violation of RICO, there is a further deficiency in the evidence on the conspiracy count. The Government failed to show that all of the defendants, particularly Bledsoe, had sufficient knowledge of the enterprise charged. Assuming a separate, identifiable enterprise was shown to have formed and operated PFA, the only cooperative in which Bledsoe participated, Bledsoe did not knowingly agree or conspire to violate RICO since there is no evidence he knew of the enterprise alleged or that he ever agreed to participate in it. Thus, at least as against Bledsoe, the conspiracy conviction could not stand. Cf. United States v. Winter, 663 F.2d 1120, 1136 (1st Cir. 1981) (requiring that defendant "knowingly join an enterprise"); Elliott, 571 F.2d at 903 ("knowledge of the essential nature of the plan is sufficient"). See also United States v. Sutherland, 656 F.2d 1181, 1194 (5th Cir. 1981). It is also questionable whether the men who served only as salesmen for the various cooperatives had sufficient knowledge to sustain a charge that they knew of and agreed to participate in a single enterprise encompassing all of the co-ops.

volumes of trial transcript, in order to evaluate the prejudicial impact of the trial court's rulings. In this case, Phillips was proven guilty of security fraud in complicity with the other defendants under counts three and four as well as in the separate sale of Progressive Investors' securities under counts five and six by overwhelming evidence.

■ This court still adheres to the practical wisdom offered by a former Chief Judge of the court, Judge Harvey Johnsen, in *Homan v. United States*, 279 F.2d 767, 771 (8th Cir.), *cert. denied*, 364 U.S. 866, 81 S.Ct. 110, 5 L.Ed.2d 88 (1960). He observed:

> Errors of the trial court which may be prejudicial in a close criminal case, in the sense of being capable in such a situation of possibly affecting the result, can well be without any such rational possibility in a strong case, and thus not entitle the defendant to a reversal of his conviction. The reviewing court must, of course, be able to say with fair assurance that the errors complained of could not, with natural operation in the total setting and proceedings had, be regarded as having possessed any influencing effect.

In reviewing the record in light of Judge Johnsen's comments, we fail to find prejudice in any of the trial court's rulings such that they could, in the midst of all the evidence against Phillips, reasonably be considered to have wrongfully influenced the jury's verdict. Phillips formed PI and actively engaged in the fraudulent sales of its securities. He also formed PFA and designed the fraudulent schemes which were perpetrated through it. There was little or no evidence refuting the overwhelming evidence of his guilt.

■ We recognize that even overwhelming evidence of guilt does not obviate the state's obligation to afford a defendant a fair trial. On this basis, we briefly discuss Phillips' primary contentions.

A. *Limitation on Expenditure for Business Consultant.*

■ Phillips submitted three proposals from business consulting firms requesting between $145,000 and $45,000 which were rejected by Judge Urbom. The judge authorized Phillips to engage expert assistance at a maximum fee of $10,000 plus $1,000 in expenses.

The granting and denial of funds under 18 U.S.C. § 3006A(e) is dependent on factual findings and evaluative judgment and thus must be committed to the discretion of the trial court. Denial or limitation of funds is not grounds for reversal absent a showing of prejudice. *United States v. Eagle*, 586 F.2d 1193, 1197 (8th Cir. 1978).

Phillips argues that he would have obtained a benefit only in his defense under counts three and four. The business consultant would have analyzed PFA and thus would not have assisted in Phillips' defense against the charges of securities fraud in the sale of PI securities contained in counts five and six.

Phillips did not demonstrate to the trial court that he could not conduct and present analysis of PFA's business and bank records and obtain testimony concerning standard accounting procedures. He was only prevented from securing the assistance of an expert to evaluate the entire business. We fail to see any abuse of the trial court's discretion.

B. *Misjoinder and Prejudicial Joinder.*

■ Phillips argues that counts five and six were misjoined with counts one through four under Fed.R.Crim.P. 8(a) and that the joinder was prejudicial.

Phillips urges several factual differences between the allegations in the two sets of counts. We conclude there was enough similarity between these counts to sustain the joinder under rule 8(a). The modus operandi of the two sets of offenses need not be identical for them to be "of the same or similar character."

Phillips also alleges prejudice resulted from the trial court's refusal to sever these counts during trial. *See* Fed.R.Crim.P. 14. First, he argues that the complexity of the

case and the number of counts—considering the incorporation of original counts three through one hundred and sixty-one into count two—imposed a prejudicial emotional and financial burden on him. However, he fails to suggest a single prejudicial effect of this burden.

Phillips also urges that the jury could not separate the evidence pertaining to the various counts. Phillips suggests that evidence admitted only to show his guilt on certain counts spilled over in the minds of the jury and was used against him under other counts. However, as this court stated in *United States v. Bowman*, 602 F.2d 160, 163 (8th Cir. 1979), when conviction of the offense described in a joined count would be admissible to show an element of the other offense—in this case, fraudulent intent—" 'criminal propensity' prejudice is in no way enlarged by joinder." We cannot overturn a refusal to sever simply because evidence against a defendant on one count is stronger than evidence against him on other joined counts. *Cf. United States v. Jackson*, 549 F.2d 517, 525 (8th Cir.), *cert. denied*, 430 U.S. 985, 97 S.Ct. 1682, 52 L.Ed.2d 379, 431 U.S. 923, 97 S.Ct. 2195, 53 L.Ed.2d 236, 431 U.S. 968, 97 S.Ct. 2928, 53 L.Ed.2d 1064 (1977). But even if Phillips could show jury confusion, he could not prove that he was prejudiced thereby because the evidence against him on *each* count was overwhelming.

## C. *Prejudicial Joinder of Burks.*

Phillips asserts that Judge Urbom erred when he failed to sever defendant Donald Burks because his counsel, Richard Anderson, was the nephew of the Government's principal witness, coconspirator Gibson. Several defendants moved to sever Burks before trial and during the early stages of the trial. Before trial, an evidentiary hearing on the issue was held and Judge Urbom decided not to sever Burks. Burks was eventually severed after an incident in the seventh month of trial which resulted in Anderson being called as a witness. Phillips cites this incident and Anderson's in-chambers testimony that Phillips had threatened various witnesses, including Gibson, and that Phillips' attorney had acted improperly as evidence of Anderson's hostility to Phillips. Phillips argues that Anderson obstructed his examination of Gibson and that Anderson's assumption of the witness role prejudiced his defense.

A trial court's decision not to sever defendants under rule 14 is a discretionary ruling and will not be considered reversible error unless defendant demonstrates actual prejudice. Review of the transcript of Phillips' counsel's cross-examination and re-cross-examination of Gibson reveals that Anderson's objections were primarily based on hearsay grounds. Several of these objections were sustained and the remainder were promptly overruled. Phillips does not reveal how the interjection of these objections prejudiced his defense.

Phillips offered no evidence and we find it unlikely that the credibility of his counsel was adversely affected by Anderson's assumption of the witness role. Again, even if any of these events had some negative impact, Phillips was not prejudiced thereby because of the overwhelming evidence of his guilt.

## D. *Admission of Taxpayer Return Information.*

The Government obtained and utilized certain information from the IRS file on Phillips. Phillips asserts that the prosecution acquired this material in violation of 26 U.S.C. § 6103(i)(1) because it did not obtain authorization from the proper official for its ex parte application to obtain the records. Section 6103(i)(1)(B) provides:

> The head of any Federal agency described in subparagraph (A) or, in the case of the Department of Justice, the Attorney General, the Deputy Attorney General, or an Assistant Attorney General, may authorize an application to a Federal district court judge for the order referred to in subparagraph (A).

In this case, the application was approved by John C. Keeney, a Deputy Assistant Attorney General. At the time he authorized the application, however, Keeney had

been designated an Acting Assistant Attorney General pursuant to 28 C.F.R. § 0.132(e). This provision governs Department of Justice offices and states:

> The head of each organizational unit of the Department is authorized, in case of absence from office or disability, to designate the ranking deputy (or an equivalent official) in the unit who is available to act as head. If there is no deputy available to act, any other official in such unit may be so designated.

We agree with Phillips' statement that section 6103 was intended to sharply restrict discretionary access to people's income tax returns and return information. But the facts of this case do not contradict that intent. Section 0.132(e) provides for the designation of an Acting Assistant Attorney General who assumes all the powers of an Assistant Attorney General. This includes the powers conferred through section 6103. The limiting effect of section 6103 is not mitigated because the acting official only assumes the powers of the designated official when the designated official is absent or disabled. We find that the procedures detailed in section 6103 were followed.

### E. Late Disclosure of Phillips' Statements.

■ Eight months prior to trial, Phillips moved for production of all relevant statements made by him which the Government possessed. The Government represented that it had disclosed all such statements. However, during the sixth month of trial, the Government disclosed a statement by Phillips taken by an IRS agent. The prosecution then assured defense counsel that no other such statements existed. One month later, the prosecution produced tape recordings of telephone conversations between IRS agents and Phillips and others. Phillips then moved for a mistrial. The motion was denied.

Phillips does not allege that the Government withheld these statements in bad faith nor does he indicate if or how the Government used these statements or how

he was prejudiced by their delayed disclosure. Failure to comply with Fed.R.Crim.P. 16(a)(1)(A) or a pretrial disclosure agreement is not grounds for reversal unless it prejudiced the substantial rights of the defendant. *United States v. Glaze*, 643 F.2d 549, 552 (8th Cir. 1981) (rule 16); *United States v. Krohn*, 558 F.2d 390, 394 (8th Cir.), *cert. denied*, 434 U.S. 868, 98 S.Ct. 207, 54 L.Ed.2d 145 (1977) (failure to disclose names of witnesses as agreed in omnibus hearing). Absent even an allegation of prejudice, the delayed disclosure of Phillips' statements is not ground for reversal.

### F. Jencks Act and Brady Material.

■ Phillips argues the Government's belated disclosure of a telephone conversation involving Gibson and an affidavit sworn to by Gibson which was taken by an IRS special agent violated the Jencks Act, 18 U.S.C. § 3500, and the rule articulated in *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963) and *United States v. Agurs*, 427 U.S. 97, 96 S.Ct. 2392, 49 L.Ed.2d 342 (1976). The Government's belated disclosure of this evidence is grounds for reversal only if earlier disclosure might have enabled a defendant to create a reasonable doubt that did not otherwise exist. *Keating v. Missouri*, 643 F.2d 1315, 1319 (8th Cir. 1981) (under *Brady* and *Agurs* line); *Scurr v. Niccum*, 620 F.2d 186, 189 (8th Cir. 1980) (same); *United States v. Glaze*, 643 F.2d 549, 552 (8th Cir. 1981) (under Jencks Act); *Kane v. United States*, 431 F.2d 172, 175 (8th Cir. 1970) (same).

■ Neither of the statements at issue were wholly withheld from Phillips, only delayed disclosure is involved. Phillips was given an opportunity to utilize both statements to impeach Gibson's testimony. Neither statement was extraordinarily damaging as impeachment. Even without using these statements, Gibson's testimony was seriously impeached. *Cf. Keating v. Missouri*, 643 F.2d 1315, 1319 (8th Cir. 1981) (adequate impeachment despite nondisclosure of bargain which induced testimony). During cross-examination and when he was recalled as a witness, Gibson was repeatedly

impeached using prior inconsistent statements; the existence of the immunity agreement which secured his cooperation with the government; the criminal tax investigation of him and recommendations of prosecution; his dislike of Phillips; his false testimony before the SEC; his nolo contendere plea to a charge in Arkansas; and several prior bad acts. In addition, Phillips introduced a large quantity of extrinsic evidence tending to impair Gibson's credibility. We conclude that belated disclosure of these statements did not prejudice Phillips' defense.

### G. Remaining Issues.

The trial judge's rulings on admission of evidence and scope of cross-examination were well within his scope of discretion. Similarly, the court's ruling on the allegation of prosecutorial misconduct was proper. Even if these rulings constituted an abuse of discretion, the evidence of Phillips' guilt on counts three through six was so overwhelming that no prejudice could have resulted therefrom.

*Conclusion.*

We affirm the convictions of Phillips under counts three, four, five, and six. Since we vacate his convictions on counts one and two, we deem it proper that Phillips be resentenced as to each of the counts for which we have affirmed his conviction.

The convictions of Bledsoe and Cloninger on counts three and four are vacated since we find they were misjoined with the separate counts five and six relating to Phillips only. These counts, as against Bledsoe and Cloninger, are remanded to the district court for a new trial. The convictions of all of the defendants on counts one and two are ordered vacated and dismissed.

The cause is remanded for further proceedings before the trial court in accord with this court's direction.

ROSS, Circuit Judge, dissenting.

In my view, the government proved that an enterprise existed through "evidence of an ongoing organization, formal or informal, and by evidence that the various associates function as a continuing unit." *United States v. Turkette*, 452 U.S. 576, 583, 101 S.Ct. 2524, 2528, 69 L.Ed.2d 246 (U.S.1981). While the government must show that the enterprise "is an entity separate and apart from the pattern of [racketeering] activity, * * * proof used to establish these separate elements may in particular cases coalesce, [but] proof of one does not necessarily establish the other." *Id.* 452 U.S. at 583, 101 S.Ct. at 2528.[1]

The facts in this case, construed in the light most favorable to the verdict, proved that under RICO these defendants and other persons charged in the indictment were "a group of persons associated together for a common purpose of engaging in a course of conduct." *Id.* 452 U.S. at 583, 101 S.Ct. at 2528.

Congress in "[s]ection 904(a) of RICO, 84 Stat. 947, direct[ed] that 'the provisions of this Title shall be liberally construed to effectuate its remedial purposes.'" *Id.* 452 U.S. at 587, 101 S.Ct. at 2531. Thus, the RICO definition of an enterprise as includ-

---

1. The Supreme Court's total statement regarding an "enterprise" in *United States v. Turkette*, 452 U.S. 576, 101 S.Ct. 2524, 69 L.Ed.2d 246 (U.S.1981) is as follows:

    In order to secure a conviction under RICO, the Government must prove both the existence of an "enterprise" and the connected "pattern of racketeering activity." The enterprise is an entity, for present purposes of a group of persons associated together for a common purpose of engaging in a course of conduct. The pattern of racketeering activity is, on the other hand, a series of criminal acts as defined by the statute. 18 U.S.C. § 1961(1). The former is proved by evidence of an ongoing organization, formal or informal, and by evidence that the various associates function as a continuing unit. The latter is proved by evidence of the requisite number of acts of racketeering committed by the participants in the enterprise. While the proof used to establish these separate elements may in particular cases coalesce, proof of one does not necessarily establish the other. The "enterprise" is not the "pattern of racketeering activity"; it is an entity separate and apart from the pattern of activity in which it engages. The existence of an enterprise at all times remains a separate element which must be proved by the Government.

ing "any union or group of individuals associated in fact," 18 U.S.C. § 1961(4), must be liberally construed.

Initially, I would emphasize my view of this case. This view is that it would be next to impossible to engage in the massive[2] sale of fraudulent securities to small investors through formation of seemingly legitimate businesses over a five year period without a "group of individuals associated in fact."

Beyond the predicate acts of racketeering, there is considerable evidence of an enterprise although, as noted in *Turkette*, the proof of each may at times coalesce. But proof of the predicate acts of securities mail fraud was sufficiently separate from the proof the government made regarding the enterprise. While some trappings of "legitimacy" may be necessary to any securities or mail fraud, this group of individuals went to great lengths to develop seemingly legitimate businesses and maintain their legitimacy while draining the assets of

the businesses through secret agreements.[3] If RICO was primarily enacted to eliminate infiltration of organized crime into legitimate businesses, I fail to see why RICO is not just as appropriate a weapon against a group of individuals who form and then use "legitimate" businesses as their vehicle for racketeering activity.

Applying the *Turkette* standards set forth above for proof of an enterprise, I believe the evidence, both direct and circumstantial, met those standards. As noted in *United States v. Elliott*, 571 F.2d 880, 898 (5th Cir.), *cert. denied*, 439 U.S. 953, 99 S.Ct. 349, 58 L.Ed.2d 344 (1978), "[a] jury is entitled to infer the existence of an enterprise on the basis of largely or wholly circumstantial evidence."

The following evidence satisfied the *Turkette* requirements that these defendants and others were an "ongoing organization, formal or informal" which "function[ed] as a continuing unit."[4] *United*

2. The government indicates that when PFA was declared bankrupt on May 13, 1977, over eleven million dollars had been raised from sales of PFA "estate builders," bonds and stock. After liquidation of PFA's assets only about $200,000 remained.

3. The enterprise formed "legitimate" cooperatives, set up "sham" boards of directors, fraudulently inflated the businesses' assets through numerous schemes to provide an appearance of prosperity, used individual and multimember "shell" consulting corporations to drain the assets of the cooperatives without the knowledge of the boards of directors or investors, carried on "promotional" activities to appear to be undertaking legitimate business development, and arranged for their accountants to treat "estate builder" sales as "income" rather than "liabilities." On the other hand, the *predicate acts* relied upon were all specific instances of using the mail in furtherance of a scheme to defraud or fraud in the sale of securities.

4. When the RICO enterprise is not a "legal entity," which may automatically provide an organization and continuity, then the proof of organization and continuity must of necessity be largely circumstantial. The jury must be allowed to look at the activities of the defendants which surround the predicate acts and draw reasonable inferences from that activity to determine whether a single enterprise exists. I believe that the Supreme Court's views regarding proof of a single "conspiracy" in *Blu-*

*menthal v. United States*, 332 U.S. 539, 68 S.Ct. 248, 92 L.Ed. 154 (1947) are helpful when considering proof of a single "enterprise." In *Blumenthal* the Court stated:

[C]onspiracies involving * * * elaborate arrangements generally are not born full-grown. Rather they mature by successive stages which are necessary to bring in the essential parties. And not all of those joining in the earlier ones make known their participation to others later coming in.

The law does not demand proof of so much. For it is most often true, especially in broad schemes calling for the aid of many persons, that after discovery of enough to show clearly the essence of the scheme and the identity of a number participating, the identity and the fact of participation of others remain undiscovered and undiscoverable. Secrecy and concealment are essential features of successful conspiracy. The more completely they are achieved the more successful the crime. Hence the law rightly gives room for allowing the conviction of those discovered upon showing sufficiently the essential nature of the plan and their connections with it, without requiring evidence of knowledge of all its details or of the participation of others. Otherwise the difficulties, not only of discovery, but of certainty in proof and of correlating proof with pleading would become insuperable, and conspirators would go free by their very ingenuity. *Id.* at 556–57, 68 S.Ct. at 256.

*States v. Turkette, supra,* 452 U.S. at 583, 101 S.Ct. at 2528.

The leader of this "enterprise" was Phillips. Gibson was a "partner" with Phillips in the formation of UFA–Mo. and the Arkansas and Oklahoma cooperatives. There is evidence that Phillips was the "instigator" of these schemes and Gibson joined in at the suggestion of Phillips.

Judge Lay argues that the dissolution of the UFA–Mo. arrangement between Phillips and Gibson caused one association of individuals to split into two separate entities. While there may be no evidence of ongoing *financial* association between Gibson and Phillips, there is circumstantial and direct evidence that they continued to be associated, in fact, as leaders of the enterprise to protect the "legitimacy" of both UFA–Mo. and PFA so as to further their common purpose.

In April 1973 when Phillips left UFA–Mo. he remained in the same city, Springfield, Missouri, and started PFA. Charles Thrower who sold "estate builders" for UFA–Mo. joined with Phillips to recruit the PFA Board of Directors. In May 1973, Gibson, at the request of Phillips, signed the cover letter submitting the PFA Articles of Incorporation to the secretary of state and mailed them for Phillips. Also in May 1973, Moffitt joined UFA–Mo. as a salesman. Moffitt had previously sold "estate builders" with Phillips through Progressive Investors. In August 1973, there was a meeting between Gibson, Moffitt, Thrower and Phillips. Gibson arranged the meeting because he had found out that Thrower had been trying to sell PFA securities to his former UFA–Mo. customers. Phillips and Thrower agreed not to call on any of the UFA–Mo. investors.[5] In the early fall of 1973, Moffitt and Gibson used a PFA "certificate of participation" [another fraudulent security] as the model for a UFA–Mo. "certificate of participation." Sometime in the later part of 1973 Moffitt joined PFA as a salesman. In early 1974, Gibson and Phillips met and Gibson told Phillips that the SEC wanted Gibson to testify about "estate builders." Phillips advised Gibson to invoke the fifth amendment, or at least not to refer to PFA's sales of estate builders or to mention Phillips' name. In March 1974, the Missouri Commissioner of Securities directed PFA to halt sales of estate builders until a disclosure letter was prepared. Phillips went to see Gibson and obtained a UFA–Mo. disclosure document from Gibson. The UFA–Mo. document was used substantially in drafting the PFA offering letter and Phillips was able to resume sales of estate builders in about one week. Finally, in early 1975, UFA–Mo. was in financial trouble and Gibson was ready to file bankruptcy. Phillips met with Gibson and convinced him to hold off until Phillips could look into the situation. About three weeks later, the Phillips/Gibson agreement to form cooperatives in other states was made and as a result of this agreement the Arkansas and Oklahoma cooperatives were eventually formed. Gibson agreed to secretly divide the profits with Phillips and Phillips agreed to provide travel and front money for the expansion *and to deal with the local banks who were putting pressure on Gibson.*

In my view this evidence shows that Gibson and Phillips continued to associate together as leaders of the enterprise even during the time that Gibson ran UFA–Mo. and Phillips ran PFA. Their leadership roles went beyond the simple selling of fraudulent securities, their roles and efforts were to maintain the "legitimacy" of the cooperatives that had been formed. The evidence supports the fact that each assisted the other in maintaining the legitimacy of not only their own cooperative but the other's cooperative. The evidence supports the inference that without the association between Gibson and Phillips in running two cooperatives in the same town, the common purpose of both may have been destroyed. *Public* financial ruin or *public* disclosure of

---

5. While this agreement might be seen as evidence of separate associations, I believe the jury could permissibly infer that this agreement furthered the activities of the enterprise by assuring that UFA–Mo. and PFA would not compete for buyers or "oversell" any one buyer.

securities violations of either of the cooperatives would very possibly have led to the downfall of the other cooperative. But this did not occur and later under their continuing leadership the affairs of the enterprise were expanded when Phillips and Gibson jointly formed the Arkansas and Oklahoma cooperatives.

Beyond the leadership of this enterprise is its ongoing organization in terms of management and operatives. Moffitt sold securities for both UFA–Mo. and later for PFA. Moffitt then became head of the UFA–Okla. sales force and later went on to sell "estate builders" for CFA–Ark.

Stafford signed a salesman contract with UFA–Mo. but did not sell for UFA–Mo. In late 1973, Stafford began selling for PFA and later in the spring of 1976 he sold for UFA–Okla. In midsummer of 1976, the Oklahoma Securities Commission filed a civil suit against UFA–Okla. and sales were halted. From late September 1976 until January 1977, Stafford sold his personal stock in PFA [6] to 19 investors who paid a total of $85,925. Cloninger told Stafford to sell the stock in the name of Consolidated Mortgage Corporation to avoid any panic by PFA shareholders that would result from a top salesman selling his own stock. Stafford told the investors that he was selling the stock of a widow.

Cloninger was not financially involved in UFA–Mo., however, he was present at Gibson's and Phillips' initial meetings and prepared a possible draft promotional brochure during one of these meetings. Gibson later adapted the brochure for use by UFA–Mo. Phillips brought Cloninger into PFA shortly after its incorporation. During the summer of 1973 Phillips and Cloninger prepared promotional materials for "estate builder" sales and a "pitchbook" for use by the PFA salesmen. The "pitchbook" is a mass of fraudulent information and omitted material facts. Cloninger helped Phillips bring into PFA the management team of Burks and Bledsoe. Each of the four took a 25% interest in the PFA-Progressive Investors "consulting agreement." Large sums of money were channeled to the four under this "consulting agreement" and large payments were made upon "termination" of the agreement in November 1975. Cloninger hired Stafford as a salesman. Cloninger was also involved in the decisions regarding the PFA–NBC merger. See footnote 6. Cloninger received payments from PFA that were channeled through five different corporations. He received payments through the Progressive Investors consulting agreement, through the PFA–NBC merger, through sale of PFA stock, and through a percentage of gross sales revenue from business operations. In early 1976, when a new type of "estate builder" was sold by PFA, Phillips' payments were funneled through one of Cloninger's corporations. Cloninger also personally bought land with his mother's PFA stock. In the last six months of PFA's "life," payments were still being made to Cloninger as an "assistant to the president" of PFA. Cloninger's grand total of monies received from PFA was $456,068. During 1975 Cloninger made one visit with Phillips to the UFA–Okla. offices. The government's evidence showed that Cloninger's main involvement was with PFA–Mo.

The government's evidence as to Bledsoe was that he was a management official of PFA–Mo. Bledsoe initially received a 25% interest in the Progressive Investors' consulting agreement and was the head of the PFA–Mo. sales force. Bledsoe was involved in the PFA–NBC merger and received monies from the sale of PFA stock. The large

6. In early 1975, PFA converted from a non-stock to a stock cooperative. The conversion occurred as part of one of the many schemes involving inflation of PFA's assets. PFA "merged" with National Business Corporation, a shell corporation involving Bledsoe, Phillips, Cloninger and Stafford. Stock and money were paid to NBC by PFA in the merger. NBC passed all the money through to Progressive Investors. Supposedly, PFA through the merger had acquired two and one-quarter million dollars worth of real estate. The land acquired was only *part* of 372 acres Phillips, through PI, had bought in April of 1974 for $29,000 cash and a $71,000 promissory note from Progressive Investors. In the "merger," PFA assumed Progressive Investors' liability on the note.

checks to the secret partners upon termination of the Progressive Investors' consulting agreement were drawn upon Bledsoe's directions. In January 1976, Bledsoe became president of PFA and Bledsoe had PFA purchase the former president's (Burks) corporation which had no business operation but merely held PFA stock and a PFA note. Bledsoe became president of FMA in October 1976 and resigned as president of PFA. However, agreements between PFA and FMA continued the flow of monies from PFA to FMA and on to Bledsoe and others. Bledsoe's grand total for PFA involvement was $407,468 according to the government.

While these defendants were part of the enterprise, they were not the only persons involved. Other persons such as Elia and Canaday sold securities for UFA–Mo. and/or PFA–Mo. and later "graduated" to management roles in UFA–Okla. and CFA–Ark.

In my view the common purpose of this "ongoing organization," to engage in securities fraud, continued nonstop until the demise of PFA in May 1977.[7] The "continuing unit" which existed apart from the acts of securities fraud is exemplified by the activities of the "leadership" (Phillips and Gibson), the "management" (Cloninger, Bledsoe and later Moffitt) and the "salesmen" (Moffitt and Stafford). The *Turkette*

requirements of an "ongoing association" and a "continuing unit" were satisfied by the proof, both direct and circumstantial, of the defendants' activities beyond the predicate acts.

*Joinder*

In my view, joinder of these defendants was proper under the case law of this circuit interpreting Fed.R.Crim.P. 8(b). Additionally, there is a growing trend among the circuits to reject the theory that misjoinder is "inherently prejudicial" and instead analyze whether there is "harmless error" under Fed.R.Crim.P. 52(a).

In *United States v. Seidel*, 620 F.2d 1006 (4th Cir. 1980) the Fourth Circuit allowed application of the "harmless error" rule to misjoinder questions.[8] In *Seidel*, the court noted that those circuits which continue to reject the "harmless error" rule are, in fact, reaching a similar result by broadening the definition of "series" in rule 8(b). *Id.* at 1017. This broadening of our definition of "series" can be seen in *Haggard v. United States*, 369 F.2d 968 (8th Cir. 1966), *cert. denied*, 386 U.S. 1023, 87 S.Ct. 1379, 18 L.Ed.2d 461 (1967) when this court stated that "[i]f the indictment invites 'joint proof' * * * or infers a common pattern of action, prima facie joinder is shown." *Id.* at 974. And in *United States v. Wofford*, 562 F.2d

---

7. It is important to note that PFA continued to operate during the existence of both UFA–Okla. and CFA–Ark. Both Cloninger and Bledsoe were continuing "management" for PFA, while Moffitt and Stafford went to Arkansas and/or Oklahoma. In my view, the absence of some defendants from the Oklahoma and Arkansas ventures does not indicate "sporadic" involvement. Rather, there was a need to keep the most successful and long-running cooperative, PFA, alive and well. UFA–Okla. sold securities for about one year until the summer of 1976. CFA–Ark. sold securities for only about three months until April 1976. In both instances, the cooperatives were shut down by the state securities commissions.

8. As noted in *United States v. Seidel*, 620 F.2d 1006 (4th Cir. 1980), the Fourth Circuit joined the Second, Sixth, Ninth and D.C. Circuits in adopting the applicability of the "harmless error" rule to misjoinder questions. If the 1896 case of *McElroy v. United States*, 164 U.S. 76, 17 S.Ct. 31, 41 L.Ed. 355 (1896) is contrary to

the decisions of those circuit courts which apply the harmless error rule, then the Supreme Court has refused a number of invitations to address this error. *See United States v. Turbide*, 558 F.2d 1053, 1061 (2d Cir.), *cert. denied*, 434 U.S. 934, 98 S.Ct. 421, 54 L.Ed.2d 293 (1977); *United States v. Franks*, 511 F.2d 25, 29–30 (6th Cir.), *cert. denied*, 422 U.S. 1042, 95 S.Ct. 2654, 45 L.Ed.2d 693 (1975); *United States v. Weiss*, 491 F.2d 460, 466–67 (2d Cir.), *cert. denied*, 419 U.S. 833, 95 S.Ct. 58, 42 L.Ed.2d 49 (1974); *United States v. Friedman*, 445 F.2d 1076, 1083 (9th Cir.), *cert. denied*, 404 U.S. 958, 92 S.Ct. 326, 30 L.Ed.2d 275 (1971); *United States v. Roselli*, 432 F.2d 879, 901 (9th Cir. 1970), *cert. denied*, 401 U.S. 924, 91 S.Ct. 883, 27 L.Ed.2d 828 (1971); *Baker v. United States*, 401 F.2d 958, 973–74 (D.C.Cir.1968), *cert. denied*, 400 U.S. 965, 91 S.Ct. 367, 27 L.Ed.2d 384 (1970); *United States v. Granello*, 365 F.2d 990, 995 (2d Cir. 1966), *cert. denied*, 386 U.S. 1019, 87 S.Ct. 1367, 18 L.Ed.2d 458 (1967).

582, 585 (8th Cir. 1977), *cert. denied*, 435 U.S. 916, 98 S.Ct. 1471, 55 L.Ed.2d 507 (1978), and *United States v. Anderson*, 626 F.2d 1358, 1373 (8th Cir. 1980), *cert. denied*, 450 U.S. 912, 101 S.Ct. 1351, 67 L.Ed.2d 336 (1981), this court upheld joinder where the defendants participated "in a *closely related* series of acts or transactions." (Emphasis supplied.) When a *pretrial* determination of the propriety of joinder is made it is "usually"[9] and "ordinarily"[10] made based on the face of the indictment. However, I do not believe there is a "rule" in this circuit that this court may only look to the indictment in determining the propriety of joinder. For example, in *United States v. Wofford, supra*, 562 F.2d at 585, this court went directly to the evidence to determine the propriety of joinder.

The face of the indictment in this case inferred a close relationship between Progressive Investors and PFA. As Judge Lay indicates the indictment alleges that Progressive Investors was the vehicle used (1) to recruit the "sham" board of directors for PFA; (2) to secretly channel PFA funds through Progressive Investors to Phillips, Burks, Bledsoe and Cloninger; (3) to transfer falsely appraised land from Progressive Investors to PFA for the purpose of inflating its assets (*see* footnote 6, *supra*). These allegations show that Phillips' use of Progressive Investors for fraud was "closely related" to the enterprise's fraudulent activity.

Additionally, the evidence showed that the sales of the Progressive Investors mortgage notes in counts 5 and 6 were made at

Phillips' direction by a PFA salesman. This salesman was "paid" by Phillips through an increase in his *PFA* sales percentage. The salesman used the same fraudulent appraisals on the "Table Rock" land to secure sales and he was told that the two buyers had previously been sold both Progressive Investors and *PFA* "estate builders." Thus both the indictment and the evidence showed a "closely related series of acts or transactions" and satisfied this circuit's standards for joinder as enunciated in *United States v. Wofford, supra*, and *United States v. Anderson, supra*.

Even if this joinder was technically improper, I believe the wisdom of the reasoning used by other circuits in adopting the "harmless error" rule must be examined. If the reason behind rule 8(b) is avoidance of mass trials, the "error" in joinder here had no effect on this trial. All of the defendants were properly joined under the RICO count.[11] The evidence as to the "estate builder" scheme used by Progressive Investors and developed by Phillips[12] was admissible to show plan and preparation under Rule 404(b) of the Federal Rules of Evidence.[13] The use of Progressive Investors by Phillips and others in the enterprise was relevant to the RICO counts. And even if counts 5 and 6 had not been joined, the government could still have introduced evidence of these sales by Phillips as evidence of "similar acts" under Rule 404.[14] My reasoning here is identical to that used by the Second Circuit in *United States v. Turbide*, 558 F.2d 1053, 1061 (2d Cir.), *cert. denied*, 434 U.S. 934, 98 S.Ct. 421, 54

---

**9.** *United States v. Sanders*, 563 F.2d 379, 382 (8th Cir. 1977), *cert. denied*, 434 U.S. 1020, 98 S.Ct. 744, 54 L.Ed.2d 767 (1978).

**10.** 8 Moore's Federal Practice ¶ 8.06[3], at 39 (2d ed. 1981).

**11.** Obviously, unlike Judge Lay, I approach the joinder question from the perspective of a valid RICO count.

**12.** Judge Urbom instructed the jury to limit all this evidence to Phillips alone.

**13.** Phillips "intent" in issuing "estate builders" was directly relevant to sales of PI "estate builders." And if, as Judge Lay states, the

legitimacy of the estate builder turns on the issuer's intent, the sales of PI securities were admissible to show "plan and preparation" by Phillips as the leader of the enterprise which issued numerous "estate builders." The "taint" from evidence of Phillips' intent is caused by Bledsoe's and Cloninger's participation in the enterprise.

I also wish to note that Bledsoe assigned the proceeds from his 25% of the Progressive Investors consulting agreement to his *personal* corporation.

**14.** Judge Urbom limited the evidence of these other sales to Phillips alone.

L.Ed.2d 293 (1977). Perhaps the hour has come for some definitive guidance by the Supreme Court on the proper interpretation of rule 8(b) or an en banc consideration of the question by our court.

For these reasons I would affirm the convictions of all defendants.