UNITED STATES, Appellee,

v.

Dwayne OWENS, Defendant, Appellant.

No. 97–1838.

United States Court of Appeals,
First Circuit.

Heard Sept. 11, 1998.
Decided March 2, 1999.

Miriam Conrad, Federal Public Defender, for appellant.

Deborah Watson, Attorney, with whom Donald K. Stern, United States Attorney, Theodore B. Heinrich, Assistant United States Attorney, and Allison D. Burroughs, Assistant United States Attorney, were on brief for appellee.

Before TORRUELLA, Chief Judge, BOUDIN and STAHL, Circuit Judges.

STAHL, Circuit Judge.

Following a twenty-one day trial, a jury convicted defendant-appellant Dwayne Owens on a number of serious charges including murder, racketeering, cocaine distribution, being a fugitive in possession of a firearm, and money laundering. In this appeal, Owens challenges his convictions on various grounds. After a careful review of the record and Owens's arguments, we affirm.

## I. Prior Proceedings and Appellate Issues

On May 14, 1996, a grand jury returned a twenty-seven count indictment against Owens and others. Underlying this indictment was the government's allegation that, from 1988 to 1995, Owens ran a large-scale drug enterprise that obtained cocaine from suppliers in New York and Florida for distribution in Massachusetts. The government also accused Owens of possessing numerous handguns, resorting to violence and threats of violence to protect his drug interests, and of the murder of one Rodney Belle, who had double-crossed him in a drug deal.

Prior to trial, Owens moved to suppress the fruits of a search of his home at 26 Parsons Avenue in East Providence, Rhode Island and a search of an automobile in which he was a passenger, conducted on an interstate highway in Memphis, Tennessee. In addition, he requested a hearing pursuant to *Franks v. Delaware*, 438 U.S. 154, 98 S.Ct. 2674, 57 L.Ed.2d 667 (1978) (holding that the Fourth Amendment entitles a defendant to a hearing if he establishes a prima facie case that a search warrant affidavit included knowingly or recklessly false statements). Although the district court denied Owens's

request for a *Franks* hearing, it did conduct a six-day evidentiary hearing on the motions to suppress, concluding that most of the objected to evidence was properly seized.

When the case was submitted to the jury, Owens was the sole remaining defendant. He was convicted on all charges pertaining to the murder of Rodney Belle, conspiracy to murder Rodney Belle, violations of the Racketeering Influenced Corrupt Organization ("RICO") Act, RICO conspiracy, interstate travel in aid of RICO, conspiracy to possess and distribute cocaine, using and carrying a firearm during a crime of violence, being a fugitive from justice in possession of a firearm, and money laundering. The jury acquitted him on a number of other charges. The district court sentenced Owens to life imprisonment.

On appeal, Owens makes a number of arguments which fall into three main categories. First, he challenges the district court's denial of his motions to suppress. Second, he argues that there was insufficient evidence to support his RICO convictions. Finally, he contends that the court delivered a number of flawed jury instructions.

We discuss each issue in turn after setting forth in context the relevant underlying facts.

## II. The Suppression Motions

### A. Standard of Review

 We review a district court's factual findings for clear error. *See United States v. McCarthy*, 77 F.3d 522, 525 (1st Cir.1996), *cert. denied*, 519 U.S. 1093, 117 S.Ct. 771, 136 L.Ed.2d 717 (1997). Where specific findings are lacking, we view the record in the light most favorable to the ruling, drawing all reasonable inferences in support of the challenged ruling. *See id.* at 529. We review a district court's legal conclusions *de novo*. *See United States v. Carty*, 993 F.2d 1005, 1008 (1st Cir.1993). In the end, we defer to a district court's denial of a suppression motion, so long as it is supported by any reasonable view of the evidence. *See id.*

### B. 26 Parsons Avenue Search

#### 1. Background

In May 1995, Boston police notified East Providence police that a man known as Don

Miley, alias Dwayne Owens,[1] was wanted for homicide in Boston, and that an accomplice of this man was cooperating with the police. This accomplice gave Boston police information about the suspect's drug trafficking activities and described his residence in East Providence. On May 18, 1995, East Providence Police Captain Joseph Broadmeadow submitted an affidavit in support of an application for a warrant to search Owens's home at 26 Parsons Avenue.[2] The warrant was granted and authorized police to search for "a black male, age 32, known as Don Miley, alias Dwayne Owens, alias [sic] with a date of birth of 6–9–63, also firearms, ammunition." The police executed the warrant on May 19, during Owens's absence from the residence, and seized extensive evidence including not only guns, ammunition, illegal drugs, and drug paraphernalia, but also personal documents, some of which were found in manila folders and envelopes.

Owens's motion to suppress the fruits of this search argued (1) that the warrant application failed to establish probable cause and the good-faith exception to the exclusionary rule did not apply; and (2) that the police exceeded the scope of their search. As an adjunct to his suppression motion, he also moved for a *Franks* hearing.

The district court granted in part and denied in part Owens's suppression motion, ruling that the warrant application established probable cause to search for firearms and ammunition, and that even if probable cause to search did not support the warrant, most of the items seized were admissible under the

"good-faith exception" recognized in *United States v. Leon,* 468 U.S. 897, 922, 104 S.Ct. 3405, 82 L.Ed.2d 677 (1984) (holding that evidence seized in reasonable good-faith reliance on a search warrant, which is later found defective, may be admitted at trial). As to the scope of the search, the court determined that certain evidence was properly seized because it was in plain view and immediately apparent as evidence of a crime or as evidence that would help lead to the apprehension of Owens, whom the officers reasonably believed was a fugitive. Although the court granted Owens's motion with respect to some items seized during the search, ruling that these documents were not immediately apparent as relevant evidence, in the end, it admitted most of the seized items, including the drugs, drug paraphernalia, and certain personal documents. The court denied Owens's request for a *Franks* hearing, finding that Owens failed to make a substantial preliminary showing that Officer Broadmeadow's affidavit contained any deliberately false or recklessly false statements.

#### 2. Discussion

On appeal, Owens renews the two arguments made in his motion to suppress. He also contends that the district court improperly denied his request for a *Franks* hearing. We disagree.

#### a. Probable Cause and *Leon*'s Good–Faith Exception

■ Assuming *arguendo* that the warrant for 26 Parsons Avenue was not supported by

---

1. The subject's name was actually Dwayne Owens, alias Don Miley.

2. The affidavit stated in relevant part:

 I have received information [from] Detective Harris, Boston Police Department of Homicide Unit that a subject known as Don Miley, alias Dwayne Owens, Date of Birth 6/9/63, described as a black male, 32 years old is wanted for homicide by Boston, Mass Police Department. An active warrant for homicide currently exists for Don Miley.... .... Boston Mass Detective Harris told your affiant that an individual is cooperating with the Boston PD in the homicide investigation. This individual was an active participant in several of the homicides. Detective Harris told affiant that the cooperating individual described an area in ... East Providence ... in

which Don Miley stored cocaine and operated a drug business.... Detective Harris also told affiant that the cooperating individual said Miley had a barbecue restaurant in the Providence area and was the owner/operator of this business. Investigation determined that this restaurant is Be Be's Barbecue, Lockwood Street, Providence. A check of business records indicates that Be Be's barbecue is owned and incorporated by Don Miley.... The telephone listed for Miley was 435–6658. This telephone is located at 26 Parsons Ave., East Providence, Rhode Island[.] 26 Parsons Avenue is rented to Don Miley which was determined by contacting the owner of this property. ... The cooperating individual ... said that Miley has numerous firearms and access to teflon bullets.

probable cause, we agree with the district court that the executing officers reasonably relied in good faith on a facially valid warrant. We therefore need not assess the constitutionality of the warrant and simply hold that the district court committed no error in denying the motion to suppress. *See Leon,* 468 U.S. at 925, 104 S.Ct. 3405 (courts have discretion to consider the issue of officers' good faith without first addressing Fourth Amendment issue).

■ There are four exclusions to the *Leon* good-faith exception: (1) "when the magistrate ... was misled by information in an affidavit that the affiant knew was false or would have known was false except for his reckless disregard for the truth;" (2) "where the issuing magistrate wholly abandoned his [detached and neutral] judicial role;" (3) where the affidavit is "so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable;" and (4) where a warrant is "so facially deficient—i.e. in failing to particularize the place to be searched or the things to be seized—that the executing officers cannot reasonably presume it to be valid." *Id.* at 923, 104 S.Ct. 3405. Owens contends that the 26 Parsons Avenue search implicates the first and fourth exclusions.

i. False Information in Affidavit

According to Owens, the affidavit improperly misled the magistrate in three respects. First, it claimed that the Boston police had a murder warrant for Don Miley when in fact the murder warrant identified the suspect only as Dwayne Owens. Second, it misstated that business records indicated Be Be's Barbecue was "owned and incorporated by Don Miley" when Don Miley was only listed in corporate documents as Vice President. And third, its statement that phone number 436–6658 was located at 26 Parsons Avenue improperly omitted that the number listed was

in the name of Johnny Stephens, not Don Miley.[3]

Owens's claims fail because he cannot establish that these misstatements were either knowingly false or reckless. At most, Broadmeadow's errors resulted from negligence, and "[a]llegations of negligence or innocent mistake are insufficient." *Franks,* 438 U.S. at 171, 98 S.Ct. 2674.

Moreover, even if any of the misstatements were knowingly false or reckless, we do not see how they were material. *See United States v. Vanness,* 85 F.3d 661, 662–63 (D.C.Cir.1996) (warrant valid under *Leon* because false statement not material). The affidavit's statement that a warrant existed for "Miley," rather than "Owens," was immaterial because the affidavit also indicated that the subject known as "Miley" used the alias "Owens." Nor can the statement that Miley was named in business records as owner rather than Vice President be characterized as material because, in either event, the suspect was linked to Be Be's Barbecue. *Cf. State v. Groff,* 323 N.W.2d 204, 210 (Iowa 1982) (stating that defendant "owns" land on which marijuana is growing, rather than that "he farms the land," is not materially false). Finally, the affidavit's failure to recite that telephone number 436–6658 was listed in the name of Johnny Stephens was not material under the circumstances. Police questioning of the landlord of 26 Parsons Avenue had already established that a man known as Miley was living at that address. It was immaterial whether Miley was living there alone or with others.

ii. Facially Deficient Warrant

According to Owens, it was unreasonable for the executing officers to rely on a warrant that he characterizes as so facially deficient as to be "bare bones." In particular, Owens complains that the affidavit demonstrated neither the recency of the informa-

---

**3.** Owens also contends that the affidavit's description of another house, the search of which is not at issue in this appeal, was not identical to the description included in another report written by Broadmeadow and therefore constitutes a false statement. Owens, however, did not make this allegation in his motion to suppress, raising it for the first time in a motion to reconsider.

Owens does not appeal the district court's denial of his motion to reconsider. Instead, he asks us to overturn the court's denial of his motion to suppress based on an allegation that was not presented in that motion. We decline this invitation. *See United States v. Zannino,* 895 F.2d 1, 9 n. 7 (1st Cir.1990) (issues not raised below are normally waived for purposes of appeal).

tion relied upon nor a nexus between the firearms and 26 Parsons Avenue. We disagree.

Despite Owens's complaints, the affidavit was sufficiently current because it stated that an "active warrant" existed for Owens, that an informant "*is* cooperating" (emphasis added) with Boston police, and that the informant described a Cole Street address as "*being* used" (emphasis added) by Owens in his drug business. From this, the executing officers could reasonably have inferred that the informant's data were recent and described an ongoing drug operation and access to firearms. *Cf. United States v. Zayas-Diaz*, 95 F.3d 105, 111 (1st Cir.1996) (affidavit not stale because references by informant were in the present tense and therefore implied regular ongoing transactions); *United States v. Schaefer*, 87 F.3d 562, 568 (1st Cir.1996) ("[I]t is common ground that drug conspiracies tend to be ongoing operations, rendering timely information that might, in other contexts, be regarded as stale.").

Owens's complaint that the affidavit failed to establish any nexus between the firearms and 26 Parsons Avenue similarly fails. The affidavit recited that Owens was wanted for murder, had "numerous firearms," and rented a house at 26 Parsons Avenue. Based on this information, it was reasonable for the executing officers to believe that firearms would be found at 26 Parsons Avenue. *Cf. United States v. Procopio*, 88 F.3d 21, 28 (1st Cir.) (nexus between evidence of crime and address to be searched sufficiently established where affidavit recited that suspect lived at that address), *cert. denied,* —— U.S. ——, 117 S.Ct. 620, 136 L.Ed.2d 543 (1996).

b. The Scope of the Search

Owens concedes that if the police were lawfully present at 26 Parsons Avenue, as we have just concluded, then the firearms and ammunition were properly seized within the scope of the search warrant, and the drugs and paraphernalia were properly seized pursuant to the plain view doctrine. He contends, however, that the police officers exceeded the proper scope of the search when they seized various personal documents which were not in plain view.

A plain view seizure is lawful if (1) the seizing officer has a prior justification for being in a position to see the item in plain view and (2) the evidentiary value of the item is immediately apparent. *See Horton v. California*, 496 U.S. 128, 136, 110 S.Ct. 2301, 110 L.Ed.2d 112 (1990). According to Owens, the officers improperly seized various personal documents because the evidentiary value of these documents was not "immediately apparent." In particular, Owens contests the seizure of the following documents, which were introduced as evidence at trial: address books, telephone bills, papers containing names and numbers, money order receipts, documents regarding gun purchases by Andrea Frith Jones, a photograph of himself with a pile of money, and a birth certificate for Donald Miley. Together, these documents helped the government establish that Owens had engaged in years of drug trafficking; had access to and used guns in connection with his drug enterprise; had access to large amounts of money; and used an alias.

Owens's argument that the seizure of these items exceeded the scope of the authorized search is not without force. But, assuming *arguendo* that the seizure of various documents was unlawful, the admission of such evidence at trial was harmless error beyond a reasonable doubt. *See Milton v. Wainwright*, 407 U.S. 371, 372–73, 92 S.Ct. 2174, 33 L.Ed.2d 1 (1972) (stating that where the jury, in addition to hearing erroneously admitted testimony, is "presented with overwhelming evidence of petitioner's guilt," error is harmless beyond a reasonable doubt). The seized documents merely corroborated the damaging and voluminous testimony which the government introduced at trial. Four participants in the enterprise testified that Owens and his colleagues engaged in years of drug trafficking. Eight witnesses variously testified that they had purchased weapons for Owens; Owens carried a weapon with him almost all the time; Owens was seen with weapons on various occasions; and Owens kept numerous weapons in his apartment. Five witnesses testified that they had seen Owens with large amounts of cash on a number of occasions. And finally, the testimony of three witnesses amply established

that Owens used the alias Don Miley. In admitting the documents, the district court's error, if any, was harmless beyond a reasonable doubt.

### c. *Franks* Hearing

 Owens also contends that the court improperly denied his motion for a *Franks* hearing. As we have stated, under *Franks*, a defendant may overcome the presumption that a warrant affidavit is valid by making a "substantial preliminary showing that a false statement knowingly and intentionally or with reckless disregard for the truth, was included by the affiant in the warrant affidavit." 438 U.S. at 155–56, 98 S.Ct. 2674. For the reasons discussed *supra* at Part II–B–2–a–i, we see no clear error in the district court's determination that Owens failed to make a substantial preliminary showing that the affidavit contained knowingly false or reckless statements. *See United States v. Parcels of Land,* 903 F.2d 36, 46 (1st Cir. 1990) (a district court's determination that the requisite showing for a *Franks* hearing is reviewed for clear error).[4] Thus, we affirm the district court's denial of Owens's motion for a *Franks* hearing.

### C. Tennessee Automobile Stop

#### 1. Background

On November 13, 1995, Patrolman Andy Boyd of the Shelby County Sheriff's Office stopped a Black Ford Thunderbird for speeding on a highway in Memphis, Tennessee. Owens was a passenger in that car. Boyd asked the driver, Devone Robinson, for his driver's license, and Robinson responded that he did not have his license with him. Boyd then asked Robinson to step out of the Thunderbird and into the patrol car so that he could do a license check. Robinson complied.

Next, Boyd separately questioned Robinson and Owens, and received conflicting responses from both men. For instance, when

Boyd asked Robinson where he was from, Robinson responded that he lived in North Carolina, even though he had earlier stated that he was from Massachusetts and Virginia. In response to Boyd's request for Owens's name, Owens responded "Robert." Robinson, however, stated that his passenger was named "Jay." The two also gave conflicting accounts of who owned the car. Robinson first stated that it belonged to Jay, then later stated that it belonged to Jay's friend. Owens, meanwhile, provided police with a vehicle registration showing the owner to be Kenneth Allen, whom Owens identified as his brother-in-law.

These contradicting statements having raised his suspicions, Boyd requested assistance, and Sergeant Mark Kellerhall arrived shortly on the scene. The officers then called for a drug dog, which had to be transported from the airport at the other side of the city. They also initiated a vehicle registration check, criminal history checks, and a National Crime Information Center ("NCIC") check to determine whether the car was stolen.

About fourteen minutes into the stop,[5] Robinson admitted that his Virginia driver's license had been suspended, a fact that the police radio channel confirmed five minutes later. Boyd then arrested Robinson for driving without a license. Normal procedure for the Shelby County Sheriff's Office dictates that when the driver-owner of a car is arrested, he is asked to sign a form authorizing the car's release to a passenger. In this case, however, the registered owner was not present, and the police continued to receive conflicting responses from the driver and the passenger regarding ownership of the car. After his arrest, Robinson changed his earlier position and stated, while pointing to Owens, that the car belonged to "Kenny." Under these circumstances, the officers elected to await the results of the vehicle registration

---

4. Owens argues that *Ornelas v. United States,* 517 U.S. 690, 116 S.Ct. 1657, 134 L.Ed.2d 911 (1996) requires us to review the district court decision *de novo.* We disagree. *Ornelas* holds that *de novo* review is appropriate for reasonable suspicion and probable cause determinations and does not apply in this case. *See id.* at 699, 116

S.Ct. 1657. In any event, we would affirm even under a *de novo* standard of review.

5. Boyd's patrol car was equipped with a video camera which recorded the time throughout the stop.

check and other inquiries to determine whether Owens had actual authority to drive the car. They did so even after a computer check revealed that the license provided by Owens, alias Davis, was valid.

About 29 minutes into the stop, the officers received the results of the criminal history checks, which indicated that Robinson had a cocaine possession charge, and that the registered owner, Kenneth Allen, had two cocaine trafficking charges and an armed robbery charge. The officers also received the results of the NCIC check, indicating that the vehicle had not been reported stolen. Boyd nonetheless waited for the results of the vehicle registration check rather than permit Owens to drive away because he believed that stolen cars did not always appear on the NCIC database.

About 49–50 minutes into the stop, while the officers were still waiting for the results of the vehicle registration check, the canine unit arrived. The police had the drug dog, Torque, conduct a sniff test on the outside of the vehicle. Torque alerted to the car, indicating the presence of drugs. The officers thereupon searched the car and found, in a secret compartment, a loaded .40 caliber Ruger, a .380 Cobray Uzi, ammunition for the Uzi, over $16,000 in cash, and several address and ledger books. The police seized all the objects in the compartment. The government introduced this evidence at trial. Subsequent clinical tests on the car revealed no drugs and no drug residue.

Owens moved to suppress the evidence seized in this search, arguing: (1) the length of the investigative stop made the stop an unlawful detention; (2) the drug dog was unreliable, so the officers lacked probable cause to search the car for contraband; and (3) even if the search was, at bottom, lawful, the officers exceeded its scope in seizing the address books and ledgers.

The district court denied Owens's motion. The court found that Officer Boyd had properly stopped the Thunderbird for speeding and arrested Robinson for driving without a license. The court also ruled that the officers were justified in detaining the Thunderbird during the time they investigated whether Owens had actual authority to drive the car. In evaluating the propriety of the dog sniff, the court reasoned that exposing the outside of the car to a dog sniff did not implicate the Fourth Amendment, and once the dog alerted to the car, the officers had probable cause to search the interior. Rejecting Owens's argument that the officers exceeded the lawful scope of their search, the court held that the search was appropriate as to all items seized from the secret compartment.

### 2. Discussion

Owens contends that the district court erred in denying his motion, and renews on appeal the arguments presented in his motion to suppress. Again, we disagree with Owens's contentions.

### a. The Length of the Stop

■ In evaluating the propriety of the Tennessee stop, we apply a two-prong test. First, we must determine whether the "officer[s'] actions were justified at [their] inception," and if so, "whether the actions undertaken by the officer[s] following the stop were reasonably responsive to the circumstances justifying the stop in the first place as augmented by information gleaned by the officer[s] during the stop." *United States v. Sowers,* 136 F.3d 24, 27 (1st Cir.), *cert. denied,* —— U.S. ——, 119 S.Ct. 105, 142 L.Ed.2d 84 (1998).

■ Owens does not challenge the initial *automobile stop for speeding as invalid under Terry v. Ohio,* 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). *See Berkemer v. McCarty,* 468 U.S. 420, 439, 104 S.Ct. 3138, 82 L.Ed.2d 317 (1984) ("[T]he usual traffic stop is more analogous to a so called 'Terry stop' . . . than to a formal arrest."). Rather, he contends that the fifty-minute detention was too long in duration to be justified as an investigative stop. Thus, his argument hinges on whether the length of the detention converted the otherwise valid investigative stop into a *de facto* arrest for which probable cause was lacking.

The reasonableness inquiry is almost always fact specific. *See United States v. Zapata,* 18 F.3d 971, 975 (1st Cir.1994) (noting

that "[t]here is no scientifically precise formula that enables courts to distinguish between valid investigatory stops and *de facto* arrests"). The Supreme Court has directed courts making this inquiry to examine

whether the police diligently pursued a means of investigation that was likely to confirm or dispel their suspicions quickly, during which time it was necessary to detain the defendant. A court making this assessment should take care to consider whether the police are acting in a swiftly developing situation, and in such cases the court should not indulge in unrealistic second-guessing.

*United States v. Sharpe,* 470 U.S. 675, 686, 105 S.Ct. 1568, 84 L.Ed.2d 605 (1985) (citations omitted).

 The fifty-minute detention was indeed a lengthy one, and in other circumstances would perhaps weigh in favor of finding a *de facto* arrest. A long duration, however, does not by itself transform an otherwise valid stop into an arrest. *See McCarthy,* 77 F.3d at 530 (stating that "there is no talismanic time beyond which any stop initially justified on the basis of *Terry* becomes an unreasonable seizure under the [F]ourth [A]mendment") (citation omitted). Here, the period of detention was justified. The officers necessarily spent the first twenty minutes trying to ascertain whether Robinson had a valid driver's license, which he did not. It was only after arresting Robinson that the officers faced the problem of whether to permit Owens to drive a car that he did not own. Moreover, events unfolded in such a manner as to raise the officers' suspicions regarding Owens's authority to drive the car: Robinson and Owens gave conflicting stories about who owned the car and Owens was evasive and avoided eye-contact during police questioning.

In responding to the circumstances, the officers diligently pursued a means of investigation that would dispel their suspicions. They initiated a number of computer checks on the car and its occupants and reasonably awaited the results. *Cf. United States v. Morales–Zamora,* 914 F.2d 200, 203 (10th Cir.1990) (holding that detention of defendants' vehicles was reasonable during time

that officers completed inspections of defendants' documents); *United States v. Walker,* 933 F.2d 812, 816 n. 2 (10th Cir.1991) (suggesting *in dicta* that length of detention would have been reasonable if police were waiting for results of an NCIC, license, or registration inquiry).

Under these particular facts, the detention was not a *de facto* arrest and the district court's finding that the officers responded reasonably to the circumstances as they developed is supported by the evidence.

### b. Reliability of Drug Dog

 The existence of probable cause based on an alert by a drug dog depends upon the dog's reliability. *See United States v. Race,* 529 F.2d 12, 14 (1st Cir.1976). During the suppression hearing, Owens and the government introduced conflicting evidence regarding Torque's reliability. Owens offered the testimony of Dr. Dan Craig, an expert on animal behavior, who, after reviewing records of Torque's failure to pass two certification tests as well as his training and performance, concluded that Torque was not reliable in vehicle searches.

The government introduced the testimony of Mark Robertson, the training supervisor for the Shelby County Sheriff's drug interdiction team, who offered explanations for Torque's failure in the certification tests. Robertson claimed responsibility for Torque's first failure, stating that he had prematurely entered the then newly trained dog in a national test against top dogs. He attributed Torque's second failure to handler error. He also emphasized that Torque was certified at the time of the Tennessee stop. In the end, Robertson testified that Torque was an extremely reliable dog, and that Torque and his handler were among the best. Torque's handler, Carrole Owen, also testified for the government, and opined that Torque's reliability was excellent. The district court ultimately credited the government's testimony and determined that Torque was sufficiently reliable to support a finding of probable cause. With due deference to the district court's greater ability to gauge the demeanor and credibility of the

witnesses, we cannot say that the court's finding was clearly erroneous.

### c. Seizure of Address Books

■ Finally, Owens asserts that even if the police officers had probable cause to search the car, they wrongly seized address books and notebooks, which were outside the scope of the plain view doctrine because their incriminating nature was not immediately apparent.

■ Owens's arguments are misplaced: officers who have probable cause to search a car for contraband are not limited in the scope of their search by the plain view doctrine. *See United States v. Ross*, 456 U.S. 798, 800, 102 S.Ct. 2157, 72 L.Ed.2d 572 (1982). Rather, "[i]f probable cause justifies the search of a lawfully stopped vehicle, it justifies the search of every part of the vehicle and its contents that may conceal the object of the search." *Id.* at 825, 102 S.Ct. 2157.

Here, the officers had probable cause to believe that the automobile contained drugs and evidence of drug trafficking. The address books and notebooks were concealed in a secret compartment, together with a large amount of cash, two guns, and ostensibly a residue of drugs. Under these circumstances, the police had probable cause to believe that the address books and notebooks were evidence of drug trafficking and thus properly seized them.

## III. Sufficiency of the Evidence

### A. Standard of Review

■ Owens argues that his RICO convictions must be set aside because the government offered insufficient proof of the "enterprise" charged in the indictment and of Owens's participation in that enterprise. In considering Owens's sufficiency claims, we must "view the evidence, together with all reasonable inferences that may be drawn therefrom, in the light most favorable to the government, ... [and consider] whether a rational trier of fact could have found guilt beyond a reasonable doubt." *United States v. Loder*, 23 F.3d 586, 589 (1st Cir.1994) (citations and internal quotation marks omit-

ted). After examining the evidence under this standard, we reject Owens's arguments.

### B. Background Facts

The indictment charged Owens and one Keillen Smith with being leaders of an enterprise, consisting of individuals "associated in fact," which operated from 1988 to 1995 and engaged in drug trafficking and acts of violence, including murder. The alleged purpose of the enterprise included "enriching members through drug trafficking and drug distribution;" "preserving, protecting and expanding the power and control of the enterprise through the use of murder, violence, threats of violence, and intimidation;" and "promoting and enhancing the enterprise and its members' drug trafficking and related activities."

During trial, the government introduced evidence that Owens and Smith were the major players in an organization, made up of two sub-groups, that supplied cocaine to the Boston area. Owens, assisted by Johnny Stephens, Robert Owens, and Coleman Essex, was in charge of supplying the organization with cocaine. Smith, assisted by Kenneth Allen, Anthony Lewis, Charles Brown, Wayne Meadows, and Gordon Lowe, was responsible for packaging and distributing the cocaine in the Boston area.

Owens first began selling cocaine to Smith in ounce quantities in 1987. By 1990, Smith had become a large-scale distributor for Owens, purchasing and reselling cocaine by the kilogram. Owens continued to sell cocaine to Smith even after Owens left Boston and began to move from state to state in order to avoid arrest. In early 1991, Owens relocated to Providence, Rhode Island, where he continued his drug trafficking activities until his arrest in 1995. While in Providence, Owens sold cocaine to Smith on a near weekly basis for $20,000 to $25,000 a kilogram. Although Smith sometimes personally collected the drugs from Owens, he usually had Lewis, Brown, or Meadows travel to Rhode Island from Massachusetts to pick up kilogram quantities. The men would return with the drugs in Owens's Thunderbird, which Owens had outfitted with hidden compartments. In Boston, Smith and his group "cooked" the

cocaine, packaged it, and distributed it to customers, making a profit of $2,500 to $5,000 for every kilogram sold. Smith's group therefore relied on Owens's group for a steady supply of cocaine, and Owens's group correspondingly depended on Smith's group for cash. The two groups collaborated on drug deals in other meaningful ways. Owens was often accompanied by members of both groups as he traveled to Florida and New York to purchase cocaine; and on at least one occasion, Smith and Owens jointly contributed $100,000 to finance a drug buying trip to Florida, which was made by Owens and Lewis.

Owens's and Smith's groups also relied on one another as they resorted to violence to protect their drug interests. On two occasions, when Owens's New York source provided cocaine that Owens deemed unacceptable, Owens and Smith, accompanied by other gang members, drove to New York to obtain redress. On one of these trips, the men were armed with guns provided by Owens. The first trip was a success as Owens and Smith, at gunpoint, extracted a refund from the source. The second "refund" trip was unsuccessful. On yet another occasion, when Rodney Belle's cohorts stole cocaine from Owens during a drug deal, Owens turned to Smith and Lewis for help, directing Smith to determine who was responsible for the theft. When Smith and Allen learned that Belle was responsible, Smith told Lewis to set up a meeting with Belle, purportedly to purchase guns. During the meeting, Owens, assisted by Lewis, Stephens, and Lowe, killed Belle.

## C. Discussion

■■■ Owens contends that the evidence suggested two separate and autonomous enterprises, one directed by Owens and the other directed by Smith. He points to testimony that Smith received less than half of his cocaine from Owens and did not know all of Owens's buyers. According to Owens, the government therefore failed to establish the existence of the enterprise charged in the indictment. We disagree.

■■■ The term "enterprise" in the RICO statute includes "any individual, partnership, corporation, association, or other le-

gal entity, and any union or group of individuals associated in fact although not a legal entity." 18 U.S.C. § 1961(c). An "association in fact" type of enterprise can consist of two illegal entities. Cf. *United States v. London*, 66 F.3d 1227, 1243 (1st Cir.1995) (holding that "two or more legal entities *can* form or be part of an association-in-fact RICO enterprise") (emphasis in original); *United States v. Turkette*, 452 U.S. 576, 585, 101 S.Ct. 2524, 69 L.Ed.2d 246 (1981) (holding that RICO applies to wholly illegal enterprises). To prove an enterprise, the government must introduce "evidence of an ongoing organization, formal or informal, and ... evidence that the various associates function as a continuing unit." *Id.* at 583, 101 S.Ct. 2524. Where two sub-groups are at issue, "what is necessary is evidence of systemic linkage, such as overlapping leadership, structural or financial ties, or continuing coordination." *Libertad v. Welch*, 53 F.3d 428, 443 (1st Cir.1995).

Here, the government introduced sufficient evidence of systemic linkages between Owens's and Smith's organizations. Members of the two groups depended on one another both financially and structurally. They regularly exchanged money for cocaine, coordinated in the transporting of cocaine to Boston, accompanied one another on cocaine buying trips, and assisted one another in acts of violence to protect their drug interests. Based on this evidence, a reasonable jury could have found, beyond a reasonable doubt, the existence of the enterprise charged in the indictment. *Compare Libertad*, 53 F.3d at 443–44 (two organizations constituted one RICO enterprise when one organization issued a press release referring to second organization as "affiliated group;" leaders of second organization "shared information" with first organization on a regular basis; and both organizations participated in one protest together); *with United States v. Bledsoe*, 674 F.2d 647, 667 (8th Cir.1982) (no enterprise where evidence showed two separate associations of individuals, with no common personnel, except one defendant who was a member of both organizations at different times).

That Smith received less than half of his cocaine from Owens and did not know all of Owens's buyers does not detract from the existence of the enterprise because RICO does not "demand total fusion or that all defendants participate in all racketeering activities, know of the entire conspiratorial sweep, or be acquainted with all other defendants." *Libertad*, 53 F.3d at 445 (citation omitted) (discussing RICO conspiracy count). Accordingly, the government sufficiently proved the existence of an enterprise.[6]

Owens's related argument, that the evidence was insufficient to show that he conducted or participated in the affairs of the enterprise, also fails because, as discussed *supra*, the evidence more than sufficiently established that Owens conducted and participated in the affairs of the enterprise.

## IV. Adequacy of the Jury Instructions

Owens challenges the adequacy of the district court's jury instructions in three respects. He claims that the court erred by: (1) failing to honor a promise to defense counsel regarding jury instructions on the elements of a violation under 18 U.S.C. § 1962(c) (conduct and participation in RICO enterprise), and disregarding Supreme Court precedent on the proper interpretation of the statute; (2) giving an improper instruction on the proof necessary to show a pattern of racketeering activity; and (3) incorrectly instructing the jury on the elements of proof

for 18 U.S.C. § 1956(a) (money laundering). We discuss each argument in turn.

### A. Conduct and Participation in Enterprise

Owens's first argument stems from his interpretation of 18 U.S.C. § 1962(c) and *Reves v. Ernst & Young*, 507 U.S. 170, 183, 113 S.Ct. 1163, 122 L.Ed.2d 525 (1993). Section 1962(c) provides that it shall be unlawful for a person "to *conduct or participate*, directly or indirectly, in the conduct" of an enterprise's affairs through a pattern of racketeering activity. 18 U.S.C. § 1962(c) (emphasis added). The indictment against Owens charged him with, *inter alia*, controlling, heading, *and* directing a RICO enterprise, rather than simply conducting *or* participating in the enterprise. Defense counsel highlighted this fact during the charge conference and, accordingly, requested the district court to instruct the jury that a conviction under 18 U.S.C. § 1962(c) must be premised on a finding that Owens "directed" the enterprise and not on a finding that he merely "conducted or participated" in the affairs of such enterprise. The government objected, arguing that directing the enterprise is not an element of the offense. The district court offered a compromise to which both parties assented:

> I think I can tie the government to the indictment but nevertheless properly

---

**6.** Owens makes two additional arguments regarding the existence of the enterprise, both of which we reject. First, he claims that the evidence failed to establish the enterprise functioned as a "continuing unit" because "the testimony showed constant changes in [Owens's] activity as he moved from Boston to Florida to Fall River to Providence." The evidence belies Owens's position. Except for a three or four month period when Owens lived in Florida, Owens sold cocaine to Smith on a regular basis over nearly a decade. Moreover, the "continuing unit" prong of the enterprise was sufficiently established by evidence that Owens's and Smith's organizations "operated as a symbiotic unit ... and ... existed for a common purpose: the economic gain of [defendants]." *London*, 66 F.3d at 1244.

Second, relying on language in *Bledsoe*, 674 F.2d at 665, Owens alleges that the evidence showed no "ascertainable structure distinct from that inherent in the conduct of a pattern of racketeering." This circuit has not adopted the

Eighth Circuit's test for "enterprise." *See London*, 66 F.3d at 1244 (without expressly adopting *Bledsoe*, assuming *arguendo* that the *Bledsoe* standard would be met in that case). But insofar as Owens complains that the evidence failed to establish an enterprise that is separate from the pattern of racketeering activity, he is wrong. *See Turkette*, 452 U.S. at 583, 101 S.Ct. 2524 (stating that "[w]hile the proof used to establish these separate elements may in particular cases coalesce ... the existence of an enterprise at all times remains a separate element which must be proved by the government"); *Aetna Cas. Sur. Co. v. P & B Autobody*, 43 F.3d 1546, 1557 (1st Cir.1994) (same). The evidence sufficiently established more than a mere series of criminal acts; and where, as here, "a group of persons associated together for a common purpose of engaging in a [criminal] course of conduct," an enterprise separate from the pattern of racketeering activity is sufficiently established. *United States v. Doherty*, 867 F.2d 47, 68 (1st Cir.1989).

frame the elements if I add in the concept lower down in the paragraph: A person may be found to participate in the conduct of the enterprise even though he has no part in the management or control of the enterprise. But here, the government has charged, and it must prove, whatever language I find there in the indictment.

■ When the court instructed the jury with respect to this issue, it began by stating that

[w]hen you come to evaluate the evidence with respect to those things that I tell you must be proved beyond a reasonable doubt, you can check against the indictment to see what [the government] ha[s] specifically charged. The case has to be proved in the manner that it was indicted. That's the charge that they have made.

But then, after giving additional instructions covering fourteen pages of the transcript, the court advised the jury that

[t]he third [RICO] element is the requirement that the evidence demonstrate beyond a reasonable doubt that [Owens] conducted or participated in the conduct of the enterprise's affairs by engaging in a pattern of racketeering activity. The term conduct and participate in the conduct of an enterprise includes the performance of acts, functions or duties which are related to the [operation] of the enterprise. A person may be found to participate in the conduct of the enterprise *even though he has no part in the management or control of the enterprise.*

(emphasis added). Owens objected to this instruction and requested that the district court instruct the jury in accordance with what it said at the charge conference, i.e., that the government must prove Owens had some role in directing the affairs of the enterprise. The district court declined to alter its instruction. Owens argues that the court's failure to instruct as he requested constitutes reversible error under Fed. R.Crim.P. 30. In relevant part, Rule 30 provides:

At the close of the evidence or at such earlier time during the trial as the court reasonably directs, any party may file written requests that the court instruct the

jury on the law as set forth in the requests. . . . The court shall inform counsel of its proposed action upon the requests prior to their arguments to the jury.

When a court fails to honor the dictates of Rule 30, reversal is warranted if defense counsel's closing argument was prejudicially affected. *See United States v. Porter,* 764 F.2d 1, 11 (1st Cir.1985).

It is a close question whether the district court violated Rule 30. The court did, after all, tell the jury that the case must be "proved in the manner that it was indicted." Nonetheless, by first telling the jury that it must look to the indictment and then, quite a bit later, instructing it on the elements of 18 U.S.C. § 1962(c), the court may well have left the jury with the impression that Owens need not have directed the enterprise. But assuming that the court's actions violated Rule 30, Owens has not explained how defense counsel's closing arguments were prejudiced.

■ To show prejudice, Owens must establish that he "was unfairly prevented from arguing [his] defense to the jury or was substantially misled in formulating and presenting arguments." *United States v. Foppe,* 993 F.2d 1444, 1451 (9th Cir.1993) (quoting *United States v. Gaskins,* 849 F.2d 454, 458 (9th Cir.1988)). Here, Owens has neither specified a defense theory the court's promise led him to forego, nor explained how his closing arguments would have differed had the court instructed in precise accordance with his request. Nor is it obvious to us what Owens's counsel otherwise might have done. Hence, the Rule 30 violation, if any, led to no apparent prejudice.

Owens's next argument, that the court's instructions on the 18 U.S.C. § 1962(c) offense were in conflict with *Reves,* also fails. *Reves* addressed the question whether "one must participate in the operation or management of the enterprise itself to be subject to liability under [18 U.S.C. § 1962(c) ]." 507 U.S. at 183, 113 S.Ct. 1163. The Supreme Court has answered this question by holding that a party *outside* a RICO enterprise is only liable if he or she participates in the operation or management of the enterprise.

*See id.* at 179, 113 S.Ct. 1163. *Reves*'s analysis does not apply where a party is determined to be *inside* a RICO enterprise. *See United States v. Houlihan,* 92 F.3d 1271, 1298–99 (1st Cir.1996), *cert. denied,* 519 U.S. 1118, 117 S.Ct. 963, 136 L.Ed.2d 849 (1997); *United States v. Gabriele,* 63 F.3d 61, 68 (1st Cir.1995); *United States v. Hurley,* 63 F.3d 1, 9 (1st Cir.1995), *cert. denied,* 517 U.S. 1105, 116 S.Ct. 1322, 134 L.Ed.2d 474 (1996); *United States v. Oreto,* 37 F.3d 739, 751 (1st Cir.1994).[7]

There is no question that Owens was an insider to the RICO enterprise. Owens supplied Smith with one to two kilograms of cocaine per week, and the two groups acted in concert with one another on several occasions to facilitate their joint interests (e.g., murdering Rodney Belle). Because Owens was not an outside contractor to the RICO enterprise, *Reves* is inapposite. The court's instruction accorded with circuit precedent.

**B. Proof Necessary to Show a "Pattern of Racketeering Activity"**

■ Owens also argues that the district court incorrectly instructed the jury on the proof necessary to show a "pattern of racketeering activity" under 18 U.S.C. § 1962(c). The district court instructed that, to establish a "pattern of racketeering activity" under RICO, the government must prove that Owens's racketeering acts "are related *or* that they amount to or pose a threat of continued criminal activity." Owens argues, and the government concedes, that Supreme Court precedent requires proof that the racketeering acts are related *and* that they amount to or pose a threat of continued

criminal activity. *See H.J. Inc. v. Northwestern Bell Telephone Co.,* 492 U.S. 229, 239, 109 S.Ct. 2893, 106 L.Ed.2d 195 (1989). Owens therefore correctly asserts that the disjunctive should have been conjunctive.

Owens, however, failed to object to this instruction in the district court, and we therefore review only for plain error under Fed.R.Crim.P. 52(b).[8] *See Johnson v. United States,* 520 U.S. 461, 466, 117 S.Ct. 1544, 137 L.Ed.2d 718 (1997); *United States v. Olano,* 507 U.S. 725, 734, 113 S.Ct. 1770, 123 L.Ed.2d 508 (1993). For Rule 52(b) to apply, an error or defect raised for the first time on appeal must be "plain," meaning "clear" or "obvious," and it must have "affect[ed] substantial rights," meaning, in most cases, "[i]t must have affected the outcome of the district court proceedings." *Olano,* 507 U.S. at 734, 113 S.Ct. 1770. Even then, error correction under Rule 52(b) is entirely discretionary, and should be exercised only when an error "seriously affects the fairness, integrity or public reputation of judicial proceedings." *Id.* at 736, 113 S.Ct. 1770.

Moreover, the Supreme Court has made it clear that where the government sets forth essentially uncontroverted evidence that overwhelmingly supports a conviction, the conviction should stand unless the defendant makes a plausible argument that the instructional error affected the verdict. *See Johnson,* 520 U.S. at 466, 117 S.Ct. 1544. At trial, the government presented evidence that overwhelmingly demonstrated Owens's involvement in large-scale drug trafficking and with associated violence from 1988 to the time of his arrest in 1995. Moreover, the

---

7. Owens contends that we should revisit First Circuit precedent interpreting the scope of *Reves.* As a newly-constituted panel, we are precluded from doing so. *See, e.g., Metcalf & Eddy, Inc. v. P.R. Aqueduct & Sewer Authority,* 991 F.2d 935, 939 n. 3 (1st Cir.1993). Owens may, of course, press this argument in a petition for rehearing *en banc.*

8. In his reply brief, Owens contends that he objected to the jury instruction. He cites, out of context, a portion of the trial transcript in which his counsel stated,

> with respect to the pattern of racketeering activity, I renew the request previously made, note our objection to the Court not including the requirement there must be evidence of

continuity, either by proof beyond a reasonable doubt, predicate acts form a closed period of repeated conduct [sic].

Despite counsel's reference to the "pattern of racketeering activity," it is clear that this statement, when read in proper context, actually refers to counsel's earlier request that the court instruct the jury that "[t]he enterprise must have an ongoing ascertainable structure and it must function as a continuing unit," an instruction relevant to the proof of the existence of an enterprise. Our careful review of the record indicates that Owens did not note his objection to the court's erroneous disjunctive in the pattern of racketeering instruction.

evidence all but compelled the conclusion that Owens would have continued to engage in such activities had the police not intervened by arresting him and ending the enterprise. Thus, there is a wealth of evidence to support the conclusion that Owens's racketeering acts were related *and* posed a threat of continued criminal activity (i.e., "pattern of racketeering"). We therefore decline to find plain error under Rule 52(b).

### C. Money Laundering

■ Finally, Owens argues that the court's instructions improperly relieved the government of proving an essential element of the money laundering offense because it erroneously *instructed the jury that it was not necessary to find that his financial transactions (i.e., drug sales) actually affected interstate commerce* in order to convict him under 18 U.S.C. § 1956(a) (money laundering).

■ To prove the offense of money laundering, the government must show, *inter alia*, that the defendant engaged in a financial transaction that affected interstate commerce. *See* 18 U.S.C. § 1956(c)(4). A minimal effect on interstate commerce is sufficient to support a conviction. *See United States v. Juvenile Male*, 118 F.3d 1344, 1349 (9th Cir.1997). If, however, there is no effect on interstate commerce, conviction is not proper. *See United States v. Grey*, 56 F.3d 1219, 1225 (10th Cir.1995).

The district court's instruction to the jury was, in relevant part, as follows:

> Now, it's not necessary for the government to show that Mr. Owens actually intended or anticipated an effect on interstate commerce *or even that interstate commerce was actually affected*. What is necessary is that it be the natural and probable consequence of his actions to affect interstate commerce, no matter how minimally.

(emphasis added). The government contends that this instruction did not constitute reversible error because, as a whole, the instructions made clear that the financial transactions at issue must have had at least a minimal effect on interstate commerce.

We have some difficulty with the government's position. The express language of the instruction informed the jury that it was not necessary to find that Owens's financial transactions affected interstate commerce to convict him of money laundering under 18 U.S.C. § 1956(a). Thus, the instructions were reasonably likely to have understated the government's burden of proof.

Again, however, Owens failed to object to the district court's instruction. Thus, once again we review for plain error. *See Johnson*, 520 U.S. at 466, 117 S.Ct. 1544; *Olano*, 507 U.S. at 734, 113 S.Ct. 1770. And again, the error does not warrant recognition under Fed.R.Crim.P. 52(b).

Underlying the charge for money laundering was the allegation that Owens used proceeds generated from his drug sales to purchase Be Be's Barbecue. The government introduced evidence that overwhelmingly established that the money for Be Be's was generated as members of the enterprise transported cocaine from Providence to Boston, sold the cocaine, and returned to Providence with the revenue. These transactions occurred on a weekly basis. Thus, by finding Owens guilty of money laundering, the jury necessarily found that Owens's activities had an effect on interstate commerce. *Cf. Russell v. United States*, 471 U.S. 858, 862, 105 S.Ct. 2455, 85 L.Ed.2d 829 (1985) (stating that the rental of real estate is unquestionably an activity that affects interstate commerce); *United States v. Westbrook*, 119 F.3d 1176, 1192 (5th Cir.1997) (purchase of two cars with proceeds of a cocaine sale affects interstate commerce), *cert. denied*, ── U.S. ──, 118 S.Ct. 1059, 140 L.Ed.2d 121 (1998); *United States v. Gallo*, 927 F.2d 815, 822–23 (5th Cir.1991) (transportation on interstate highway of drug trafficking proceeds affects interstate commerce).

### V. Additional Claims

■ Owens makes a number of additional claims on appeal, none of which merits more than brief mention. First, Owens argues that the district court abused its discretion in accepting co-defendant Johnny Stephens's guilty plea after, rather than before, deliver-

ing its preliminary instructions to the jury. We see no such error. *Cf. United States v. Chapdelaine*, 989 F.2d 28, 32 (1st Cir.1993) (no error when district court accepted co-defendant's guilty plea after government completed presentation of its case); *United States v. Del Carmen Ramirez*, 823 F.2d 1, 3 (1st Cir.1987) (no error when district court accepted co-defendants' guilty pleas during second day of trial).

Second, we also reject Owens's fall-back argument that the district court's jury instructions with respect to Stephens's sudden absence did more harm than good by highlighting this absence and thereby suggesting that Stephens had pleaded guilty. The district court instructed:

> You will note ... that Mr. Stephens and his attorneys are no longer present, and in fact, you are not going to be asked anything about those charges. That is no longer part of this case. You don't speculate about that, don't speculate about that in any way. The case now is the case of the government, Mr. Dwayne Owens and only Mr. Dwayne Owens. You're just not going to be asked about Mr. Stephens.

These instructions are almost identical to jury instructions that have been approved by this court in similar circumstances. *See Chapdelaine*, 989 F.2d at 32; *Del Carmen Ramirez*, 823 F.2d at 3. Moreover, our system of trial by jury is premised on the assumption that jurors will scrupulously follow the court's instructions, *see Richardson v. Marsh*, 481 U.S. 200, 206, 107 S.Ct. 1702, 95 L.Ed.2d 176 (1987); *United States v. Rivera–Gomez*, 67 F.3d 993, 999 (1st Cir.1995), and we therefore assume that the jury, upon hearing the court's instructions, refrained from speculating about Stephens's absence from the court.

Third, we reject Owens's claim that the district court abused its discretion in failing to hold a post-judgment hearing regarding possible jury taint after a defense investigator reported that she overheard one juror tell another: "It's a good thing you remembered about Johnny Stephens." Owens claims that this statement suggested the juror had been exposed to publicity during the trial. We disagree. The trial was replete with testimony concerning Stephens's

involvement in the RICO enterprise as well as evidence concerning Owens's use of "Johnny Stephens" as an alias. The juror comment certainly was as likely related to these issues as it was indicative of jury taint. Indeed, the court asked the jury throughout trial whether it had been exposed to publicity about the trial, and the jury consistently denied any such exposure. Under these circumstances, we cannot say that the district court's refusal to hold a post-judgment evidentiary hearing was an abuse of discretion.

Fourth, the district court did not, as Owens asserts, err in refusing to excuse a juror for cause when that juror initially expressed doubt about her ability to fairly consider the evidence, but ultimately stated that she would try to do so. "There are few aspects of a jury trial where we would be less inclined to disturb a trial judge's exercise of discretion, absent clear abuse, than in ruling on challenges for cause in the empaneling of a jury." *United States v. Gonzalez–Soberal*, 109 F.3d 64, 69–70 (1st Cir.1997). We see no clear abuse in the court's refusal to dismiss the juror.

Finally, the district court did not, as Owens contends, err in refusing to define reasonable doubt in its instructions to the jury. It is well established that courts are not required to define the concept of reasonable doubt. *See Victor v. Nebraska*, 511 U.S. 1, 5, 114 S.Ct. 1239, 127 L.Ed.2d 583 (1994) ("[T]he Constitution neither prohibits trial courts from defining reasonable doubt nor requires them to do so as a matter of course."); *United States v. Whiting*, 28 F.3d 1296, 1303 (1st Cir.1994) ("This circuit has repeatedly refused to require the district courts to define 'reasonable doubt' in their instructions to the jury.") (citing cases). Nor did the court impermissibly dilute the reasonable doubt standard with the instructions it did provide the jury.

## VI. Conclusion

For the foregoing reasons, we affirm Dwayne Owens's convictions in all respects.

*Affirmed.*